**NEW YORK, N. H. & H. R. CO. v. PASCUCCI.**

**No. 2500.**

Circuit Court of Appeals, First Circuit.

Feb. 11, 1931.

Madison G. Gonterman, of Boston, Mass. (Eugene J. Phillips, of Providence, R. I., on the brief), for appellant.

John V. Spalding, of Boston, Mass., for appellee.

Before BINGHAM, WILSON, and HALE, Circuit Judges.

WILSON, Circuit Judge.

This is an action to recover under the Federal Employers' Liability Act (45 USCA §§ 51–59) for injuries received through the alleged negligence of the defendant and appellant in this action. The case was submitted to a jury, which awarded a verdict for the plaintiff.

■ There is no question but that the work in which the plaintiff, and appellee before this court, was engaged related to interstate commerce, and that he was subject to the Federal Employers' Liability Act. It is contended at the outset, however, that the action was not brought within the two-year period of limitation fixed by the act. Under the law of Massachusetts and according to what now appears to be the uniform practice in the federal courts, an action is begun within the period of limitation when in good faith a writ is placed in the hands of an officer for service. Linn & Lane Timber Co. v. United States, 236 U. S. 574, 578, 35 S. Ct. 440, 59 L. Ed. 725. United States v. Northern Finance Corp. (C. C. A.) 16 F. (2d) 998. This was a question of fact. On this point we cannot say that the jury found in favor of the plaintiff without substantial evidence to support their finding.

It is further urged that the defendant violated no duty it owed to the plaintiff, and that the plaintiff's injuries resulted from dangers, the risk of which he assumed as one of the incidents of his employment.

The undisputed facts are as follows: The plaintiff was employed by the defendant as a laborer and repair worker on its tracks and roadbed. He had been in its employ for some time, and at the time of his injury was an assistant or subforeman of a crew of men. On the morning of his injury he, with his crew, was brought into Boston from Readville on a worktrain to work on a drain underneath or alongside the tracks of the defendant, between the place where the injury occurred and South Station. They detrained at the Back Bay Station, where they were met by an assistant superintendent to give the foreman in charge directions for the day's work. They then proceeded along the tracks of the defendant toward the Tremont street or Castle Square bridge, which, by reason of its construction, forms a tunnel 230 feet long, in which are two incoming and two outgoing tracks of the defendant separated by a brick wall.

Just before arriving at the Tremont street bridge, two regular trains going west passed under the bridge, filling the tunnel with smoke. The men waited for the smoke to clear up, and then started to walk through on the outbound tracks. When they were within 70 feet of the farther end of the bridge, a train passed on the Boston & Albany tracks, which are parallel with those of the New York, New Haven & Hartford Railroad, and are separated from them by a brick wall with semicircular openings in the upper half, and which formed one side of the tunnel through which the men, led by the plaintiff, were then proceeding. Through these openings smoke and steam from the Boston & Albany train poured and again filled the tunnel, so that it was impossible to see objects even a few feet away. Evidently, fully aware of the possible danger from a "draft" or a "switching", or a special train entering the tunnel, they stopped and waited for the smoke to clear up, when suddenly out of the smoke appeared what proved to be a "draft," so called, composed of three empty passenger cars, an engine, and tender, which was being backed from the South Station into the Roxbury yard. Some of the crew succeeded in reaching points of safety. The plaintiff, who was nearer the on-coming cars, failed to do so, and was hit by one of the cars and severely injured.

It is also undisputed that before the smoke filled the tunnel the men could see through the tunnel and beyond for nearly, if not quite, 900 feet, and saw no train approaching. It is also undisputed that, when the "draft" came around a curve, eight or nine hundred feet from the tunnel, the tunnel was already filled with smoke from the Boston & Albany train, and, without slackening their speed or giving any warning by lights, whistle, or bell, the "draft" backed into the smoke-filled tunnel.

There are some disputed questions of fact which are stressed by counsel on one side or the other. The plaintiff testified, and his testimony was corroborated by two or more of the crew, that the assistant superintendent, after the smoke had cleared away, before the men entered the tunnel, said to them: "Go ahead. There will not be another train for fifteen or twenty minutes," or words to that effect. Others of the crew said they did not hear that statement. Whether given or not, it is quite clear that the plaintiff and the other members of the crew did not understand that it meant there would be no "draft," or switching, or irregular movement of cars during that period, since as soon as they found themselves enveloped in smoke they all stopped and waited, and, as one or more testified, they were on the "watch for all trains, all the time."

There is a rule of the railroad company that, on all "drafts" backing within the yard, there must be two men on the rear platform of the first car as the draft proceeded, "to watch for and call signals." There was some question raised by the plaintiff's testimony as to whether this rule was complied with; but we think the jury upon the evidence was not warranted in finding, nor do we know that they did find, that there was a breach of this rule, or that it was adopted to insure the safety of track workers. Of course, if the men on the rear platform saw conditions endangering the lives of workmen, which it was within their power to avoid, it would be their duty to do so, though not stationed on the rear platform for that purpose.

Such "drafts" are obliged to proceed according to block signals controlling all train movements in the yards. An engineer or fireman while backing a "draft" obviously could not see the block signals, and such a movement, therefore, absolutely requires two men on the rear platform to watch for the signals and call to each other, operate air brakes, and control the movement of the train according to the signals. The two men supposed to be on the rear platform of the "draft" in this instance testified that they were at their stations, and controlled the movement of the "draft" on that morning in accordance with the signals; that they were obliged to stop at the block next beyond the Tremont street bridge; and there is no question but that the "draft," after entering the tunnel, came to an emergency stop as the air brakes were applied. The engineer testified that he did not apply them; that he did not know until some time afterward the rea-

son for their application. It is obvious, we think, from the record, that the air brakes must have been applied by men on the rear platform. In the smoke which rendered the tunnel as dark as midnight, it would be nothing unusual that the men in there, under the circumstances, did not notice the men on the rear platform.

The testimony also differs as to the speed of the train. The men estimated it as 15 to 17 miles per hour, and the trainmen from 6 to 8. According to the first estimate, it was covering from 21 to 25 feet per second; and, according to the last, only 9 to 12 feet per second. The plaintiff contends that his estimate is corroborated by the distance that the train went after the brakes were applied, viz. from 150 to 160 feet. One of the defendant's witnesses admitted that. when traveling from 6 to 8 miles per hour, a "draft" such as this was, by an application of the air brakes, could be stopped in 20 feet. The distance it actually traveled was accounted for by the defendant's witnesses by a "bad rail," and the train sliding. The jury, however, may have reasonably accepted the testimony of the plaintiff and his witnesses and found that the train was traveling from 15 to 17 miles per hour when it entered the tunnel.

The appellant contends that this was a switching movement. Whether a switching movement in the usual sense in which the term is used in railroad parlance, it was within a yard and was not on a regular schedule. The appellant, in view of these facts, urges that it was not obliged to ring a bell, sound a whistle, or show any lights, especially in the daytime; that the rule of law governing such conditions is that workmen in a yard must look out for their own safety; that these workmen had been so instructed; that they were employed in a dangerous work and assumed all the ordinary risks resulting therefrom, and all the extraordinary risks of which they had notice and appreciated; and that the latter includes the negligence of a fellow servant, although under the Federal Employers' Liability Act the defense of negligence of a fellow servant is abolished as well as that of contributory negligence, except that the latter may be considered in fixing the damages. Aerkfetz v. Humphreys, 145 U. S. 418, 12 S. Ct. 835, 36 L. Ed. 758; Toledo, St. L. & W. R. R. v. Allen, 276 U. S. 165, 169, 48 S. Ct. 215, 72 L. Ed. 513; Boldt v. Pennsylvania R. R. Co., 245 U. S. 441, 445, 38 S. Ct. 139, 62 L. Ed. 385; Davis v. Philadelphia & R. Ry. Co. (D. C.) 276 F. 187.

We do not think we can apply these doctrines as strictly as in the cases cited to the facts in this case. In this instance the defendant knew that it had workmen employed on the tracks just beyond the tunnel toward South Station. It knew that its working crew on this morning was being landed at Back Bay Station at approximately the time the "draft" was released to be taken to the Roxbury yard; that it would reach this tunnel about the time this working crew would be passing along these tracks on their way to the locus of their work. It was familiar with the conditions existing in this tunnel whenever trains passed over its own tracks or on the Boston & Albany tracks; yet, with full knowledge of these conditions and that the tunnel was filled with smoke, and the possibility that this working crew might be in there on their way to their work, it permitted a "draft" to run into this tunnel, as the jury may have found, at the rate of 15 or 17 miles per hour, without even a whistle or a horn that could be operated by the men on the rear platform. To back a train without warning even in a yard into a smoke-filled tunnel at such a rate of speed where workmen passing through might be caught, the jury may have found was a violation of a duty the defendant owed to these men, and that it was not unreasonable to require it either to slacken the speed of a "draft" under such circumstances, or provide the men on the rear platform with some means of giving warning to men who might, without their fault, be caught like "rats in a trap." It is not a case where one man in a crew could watch and give notice of approaching trains, as in McGovern v. Phila. & Reading R. R., 235 U. S. 389, 35 S. Ct. 127, 59 L. Ed. 283. The conditions producing the injuries in this case occurred so nearly contemporaneously that the men were practically helpless to avoid the danger.

It is obvious that there would have been much more time to reach a point of safety if the train were moving only 6 to 8 feet per second, than if it were moving 25. At the rate the crew testified the train was moving, it would only take three seconds for it to reach the plaintiff after it entered the tunnel, and from ten to twelve seconds if it were going only 6 to 8 miles per hour.

As the court said in Central R. R. of N. J. v. Sharkey, 259 F. 144, 149: The doctrine stated in Aerkfetz v. Humphreys, supra, "is to be understood in the light of the circumstances of that case. * * * But we do not understand that the court meant to lay down the doctrine that under no circumstances could it be negligence if an engine in a railroad yard failed to blow its whistle or ring its bell." Also see Colasurdo v. Central R. R. of N. J. (C. C.) 180 F. 832, affirmed in (C. C. A.) 192 F. 901. In other words, circumstances may arise under which a railroad is required to take some precautions to protect workmen in its yards.

In Smith v. Payne (C. C. A.) 269 F. 1, 3, the court said: "But in order to safeguard himself from the ordinary dangers of his employment, as the law requires him to do, a track employee is not called upon to seek out and discover extraordinary dangers imposed on him by his employer, but may assume that his employer and his agents have exercised for his safety such care as the circumstances reasonably admit"—the court adding in Ches. & Ohio Ry. v. De Atley, 241 U. S. 310, 36 S. Ct. 564, 566, 60 L. Ed. 1016: "Unless the want of care and the danger arising from it are so obvious that an ordinarily careful person, under the circumstances, would observe and appreciate them." "The federal Employers' Liability Act places a coemployee's negligence, when it is the ground of the action, in the same relation as that of the employer upon the matter of assumption of risk." See Chicago, R. I. & P. Ry. Co. v. Ward, 252 U. S. 18, 21, 22, 40 S. Ct. 275, 276, 64 L. Ed. 430.

On the issue of assumption of risk, the burden of proof is on the employer under the Federal Employers' Liability Act; and, unless the evidence undisputedly shows that the employee assumed both the ordinary risks incident to the employment, or the extraordinary risks of which he had notice and appreciated, the question is one for the jury. Kanawha & Mich. Ry. Co. v. Kerse, Adm'r, 239 U. S. 576, 36 S. Ct. 174, 60 L. Ed. 448; Chicago, R. I. & P. Ry. v. Ward, supra.

The absence of all obligations on the part of the appellee to take any precautions in case of track workers who were unexpectedly caught under the condition existing here is not so clear as to be a question of law. "The general rule is that questions of negligence do not become questions of law, which justify the direction of a verdict, except where all reasonable men must draw the same conclusions from the evidence." Chicago, St. P., M. & O. Ry. Co. v. Nelson (C. C. A.) 226 F. 708, 711.

We think the judge of the District Court was right in submitting the case to the jury, and the jury's verdict must stand.

The judgment of the District Court is affirmed, with costs.