## UNITED STATES v. HARDY et al.
### No. 3658.

Circuit Court of Appeals, Fourth Circuit.
Jan. 8, 1935.

J. P. Jackson, Sp. Asst. to the Atty. Gen. (Frank J. Wideman, Asst. Atty. Gen., Se-

wall Key, Sp. Asst. to the Atty. Gen., and George I. Neal, U. S. Atty., and Okey P. Keadle, Asst. U. S. Atty., both of Huntington, W. Va., on the brief), for appellant.

Hawthorne D. Battle and Robert S. Spilman, both of Charleston, W. Va. (Price, Smith & Spilman, of Charleston, W. Va., on the brief), for the United States.

Before PARKER and SOPER, Circuit Judges, and MYERS, District Judge.

SOPER, Circuit Judge.

This suit in equity was brought by the United States to recover the sum of $15,622.-95 as a deficiency in the income and profit taxes for the year 1918 of the Harris-Hardy Company, a West Virginia corporation, on the ground that the defendants, as stockholders of the company, became transferees of its assets upon its dissolution on June 9, 1919. The defense on the merits was that in the year 1918 the company had suffered a permanent loss in relation to an exclusive sales agency which it controlled, and was therefore entitled in computing its net income to a deduction under section 234 (a) of the Revenue Act of 1918, 40 Stat. 1057, 1077, and under article 143 of Treasury Regulations 45 (1920 Edition), which provide that a taxpayer may claim such a loss when through some change in business conditions, the usefulness of capital assets is suddenly terminated so that he permanently discards them. This defense was sustained, and the United States appealed.

■ The District Judge also decided that the suit was barred by limitations, because it was not begun within five years after the date when the taxpayer's return for 1918 was filed, as required by section 250 (d) of the Revenue Act of 1921, 42 Stat. 227, 264. The return was mailed by the taxpayer on April 12, 1919, at Charleston, W. Va., to the collector of internal revenue at Parkersburg, W. Va., a distance usually covered in seven or eight hours by train. Ordinarily, delivery of the return to the collector would have occurred on the next day, but April 13, 1919, was Sunday, a fact to which the attention of the District Judge was not called, and hence delivery could not be made until Monday, April 14, 1919. This suit was instituted on April 14, 1924, at Charleston, W. Va., and on the same day subpœnas were issued by the clerk of the court, and received by the marshal on April 15, 1924. It thus appears that the bill was filed within the period of limitations. The terms of the statute are

that "no suit or proceeding for the collection of any such taxes * * * shall be begun, after the expiration of five years after the date when such return was filed." It is a general rule that, when the period allowed for doing an act is to be reckoned from the happening of any other event, the day on which the event happened may be regarded as a point of time and so may be excluded from the calculation; and this rule has been applied to the statute under consideration in Burnet, Commissioner, v. Willingham L. & T. Co., 282 U. S. 437, 51 S. Ct. 185, 75 L. Ed. 448.

■ It is suggested, however, that a suit in equity in a federal court is not begun until the delivery of the subpœna to the marshal, which in this case did not take place until April 15th. The early chancery practice would have given support to this contention. The better rule to be applied, we think, is that a suit is commenced by the filing of the complaint with the bona fide intent to prosecute the suit diligently, provided there is no unreasonable delay in the issuance or service of the subpœna. Equity Rule 12 (28 USCA § 723) provides that, whenever a bill is filed, the clerk shall issue the process of subpœna thereon as of course, upon the application of the plaintiff, and Equity Rule 15 (28 USCA § 723) provides that the service of the process shall be by the marshal of the district. And so it has been held in this circuit and elsewhere that it is the filing of the complaint rather than the issuance of the subpœna that marks the commencement of the suit. Farmers' Loan, etc., Co. v. Lake St. Elevated R. Co., 177 U. S. 51, 60, 20 S. Ct. 564, 44 L. Ed. 667; Armstrong Cork Co. v. Merchants' Ref. Co. (C. C. A.) 184 F. 199, 206; Brown v. Pacific Mutual Life Ins. Co. (C. C. A.) 62 F.(2d) 711. Compare Linn & Lane Timber Co. v. U. S., 236 U. S. 574, 578, 35 S. Ct. 440, 59 L. Ed. 725; United States v. American Lumber Co. (C. C. A.) 85 F. 827, 829; United States v. Northern Finance Corp. (C. C. A.) 16 F.(2d) 998; New York, etc., R. Co. v. Pascucci (C. C. A.) 46 F.(2d) 969.

■ On the merits, the defense relates to the loss by the taxpayer in 1918 of a valuable asset, consisting of an exclusive sales agency for the sale, in the greater part of West Virginia, of a near beer called "Bevo," manufactured from malt by the Annheuser-Busch Brewing Association of St. Louis. Shortly after its formation in September, 1916, the Harris-Hardy Company purchased the agency from Harris and Hardy for

$100,000, payable in the stock of the corporation at par. In addition, the company issued an additional $100,000 of common stock for cash. The business of distributing Bevo in West Virginia was highly profitable from the very beginning. A short time after the formation of the company, some of the stock was sold for $160 per share. In September, 1917, the corporation returned two-fifths of its entire capital by the distribution of $80,000 in cash amongst its stockholders. Early in 1918 it paid the sum of $15,000 for an exclusive sales agency for Bevo in certain counties in Virginia, and charged the cost thereof on its books to general expenses. The District Judge found as a fact that the fair market value of the exclusive sales agency for West Virginia, at the time that it was transferred to the corporation, was at least $100,000.

On September 16, 1918 (40 Stat. 1848), the President of the United States, acting under the authority of the Lever Act (40 Stat. 276), issued a proclamation prohibiting the use of sugar and certain cereals in the production of malt liquors, including near beer for beverage purposes. The proclamation provided that after October 1, 1918, such materials should not be used except as to malt already made, and that after December 1, 1918, no malt should be used for this purpose. Malt was an essential substance in the manufacture of Bevo, and the sale of Bevo was the entire subject-matter of the agency which the corporation held from the brewing association. Unsuccessful efforts were made after the proclamation to induce the President to rescind it. Under these circumstances, the directors of the corporation, on October 18, 1918, by resolution directed that the entire valuation of its company's agency be charged off on the books of the company as a loss. The agency contract for the Virginia counties was not charged off as a loss because the cost thereof had been entered upon the books as an expense item. The company continued to sell Bevo made from the malt previously manufactured until December 1, 1918, and thereafter, until the end of the year, it sold no Bevo and did no business of any kind; and the conditions which actuated the directors in charging off the contract as a loss in October continued during the balance of the year.

On March 4, 1919 (40 Stat. 1937), the President rescinded his proclamation, and from that date until May 2, 1919, the taxpayer attempted to resume the sale of Bevo, but its gross income was small and it incurred a loss for the period in excess of $1,500. On May 2, 1919, at a special meeting of the stockholders of the company, the offer of one John A. Dana to purchase the agency contracts of the company for the sum of $15,000 was accepted. The officers of the company were directed to pay off the debts and distribute the remaining assets to the stockholders and to surrender the charter of the company. Pursuant to this resolution, substantial sums were distributed to the stockholders who are defendants in this case, and the corporation was dissolved.

The purchaser of the contract from the corporation in June, 1919, associated himself with Harris and Hardy, and thereafter conducted the business in a small way. A small profit was made during the years 1919, 1920, and 1921, but the business gradually declined, and was finally given up. It is a fair inference that the price received by the corporation for the contract in June, 1919, was influenced by the fact that the sale was actually made to persons who, as stockholders of the selling corporation, were to share in the proceeds of sale.

Upon these facts, the District Judge found that the agency contracts were of no value on December 31, 1918, by reason of the proclamation of the President; and that the action of the company on October 18, 1918, in charging off on its books the sum of $100,000 as a loss, was justifiable. Some question is raised, as to the cost of the agency contract to the corporation, for that, rather than the actual worth of the contract upon its acquisition, must be taken as the basis for computing the loss occasioned by the President's proclamation under the provisions of section 202 (a) of the Revenue Act of 1918 (40 Stat. 1060), which provides that, for the purpose of ascertaining a loss sustained from a sale or other disposition of property, the basis, in the case of property acquired after March 1, 1913, shall be the cost thereof. The cost to the corporation was the value of the stock given for the agency at the time of its issuance; and it is suggested that, notwithstanding the sale of certain shares at $160 per share, the evidence was insufficient to show that it was worth par when issued. It is clear, however, from the evidence that the stock, when issued in the year 1916, was worth at least as much as the net income of the corporation in 1918, to wit, $40,269.98, computed without making any allowance for the destruction of the business.

■ The real question, therefore, is whether it may be fairly said that the corporation was justified in charging off the value of the contract on its books in 1918 as a loss sustained during the taxable year within the meaning of section 234 (a) of the Revenue Act of 1918 (40 Stat. 1077). The law is clear that, to justify such an action, the loss must be fixed by definite identifiable events, such as the sale or other disposition of the property. United States v. S. S. White Dental Mfg. Co., 274 U. S. 398, 47 S. Ct. 598, 71 L. Ed. 1120; Forbes v. Commissioner (C. C. A.) 62 F.(2d) 571; Coalinga-Mohawk Oil Co. v. Com. (C. C. A.) 64 F.(2d) 262; Royal Packing Co. v. Lucas (C. C. A.) 38 F.(2d) 180; Liberty Baking Co. v. Heiner (C. C. A.) 37 F.(2d) 703.

The government contends that, although the President's proclamation did bring about a change in business conditions and affect the usefulness and value of a capital asset of the corporation, the evidence does not show that the taxpayer discarded that asset permanently from use in the year 1918, within the meaning of article 143 of the Regulations. The proclamation of the President, it is urged, was a temporary war measure, adopted to insure an adequate and continuous supply of food; the Armistice was declared and the war was virtually at an end on November 11th of the tax year, and therefore the corporation had facts within its knowledge that would lead it to believe that the restraint upon its operations would soon be lifted. Moreover, in March of the following year, the President rescinded his proclamation, the company resumed the sale of Bevo, and finally, on June 9th, sold its agency contract for the sum of $15,000.

These considerations are not without weight; but, when we take into account the facts as they existed during the tax year, and the effect which they had upon the business of the corporation, and the actions of its officers, we are satisfied that the ruling of the District Judge was correct. The immediate and devastating effect of the President's order upon the taxpayer's business during the year 1918 cannot be denied; and the deliberate judgment of the interested parties at the time, that thereby the contract as a capital asset had been destroyed, cannot be ignored. That these parties had no ulterior motive is shown by the fact that, in ignorance of their rights, they failed to take a deduction of the loss in making the tax return of the corporation for the year; and

the resolution of the directors of October 18, 1918, must be taken as an expression of their bona fide conviction that a permanent loss had been suffered. It was indeed apparent that a war power was being exercised, and that at some indefinite time in the future the sale of near beer might again be lawfully resumed. But the article of merchandise with which the company was concerned was not a staple product certain of continued popularity under its distinctive trade-name, and any cessation of its use was likely to be fatal to the business. The President had refused to rescind his order in October, and he made no move in 1918, even after the Armistice, to remove the ban. The result was that the business of the corporation absolutely ceased in the month of December, and no one could say with reasonable assurance that it would ever be possible to resume it again.

■ The unsuccessful efforts of the corporation to revive the business in 1919, and the subsequent sale of the agency at a fraction of its former value, and the continuance of the business in a small way by the purchaser with the assistance of some of the former stockholders, do not in our opinion require a contrary conclusion. When, in the exercise of an impartial judgment based upon experience, the conclusion has been fairly reached that a capital asset should be permanently discarded as valueless, it is proper for the business to avail itself of the provisions of Regulation 143, and it is not essential to show that there is no possibility whatsoever of any ultimate recovery. Regulations 141, 144, and 151, relating to worthless debts and worthless corporate stock, were given a similar interpretation in United States v. S. S. White Dental Mfg. Co., 274 U. S. 398, 47 S. Ct. 598, 71 L. Ed. 1120, where it was held that the American owner of stock of a corporation in Germany was entitled to deduct the entire amount of his investment from his gross income, when the assets and business of the company were sequestered by the German government during the war, although, after the war, the possession of the assets and business was relinquished to the German corporation by the sequestrator and some recovery was made by the taxpayer. See, also, Forbes v. Commissioner (C. C. A.) 62 F.(2d) 571, in which this court held that a loss in the value of stock of a corporation owned by the taxpayer might be taken as a deduction, although some business was done by the corporation after the expiration of the tax year,

since the worthlessness of the stock at the time it was charged off as a loss was reasonably apparent. See, also, Wheeling Tile Co. v. Commissioner (C. C. A.) 25 F.(2d) 455; Denman v. Brumback (C. C. A.) 58 F.(2d) 128; DeLoss v. Commissioner (C. C. A.) 28 F.(2d) 803.

We have not overlooked the decision in Clarke v. Haberle Crystal Springs Brewing Co., 280 U. S. 384, 50 S. Ct. 155, 74 L. Ed. 498, where it was held that the provisions of section 234 (a) (7) of the Revenue Act of 1918 (40 Stat. 1077), which allow as a deduction from income a reasonable sum for the exhaustion or obsolescence of property used in a business, were not intended to cover the exhaustion or obsolescence of the good will of the brewery due to the imminence of national prohibition. It was said that the owners of a business "extinguished as noxious under the Constitution" could not demand compensation from the government, and that it was incredible that Congress should have meant to enable parties to cut down their taxes by an Act approved on February 24, 1919, after the Eighteenth Amendment had been submitted to the states and ratified by a sufficient number of them to give it effect. The feature of the present case, which distinguishes it from this decision, is the nature of the article that the taxpayer was organized to sell. There is nothing which leads us to believe that Bevo possessed the "noxious" quality of certain beverages that led to the passage of prohibitory enactments; and hence the taxpayer, as one engaged in an ordinary business, came within the purview of the taxing statutes, and was entitled to the beneficial provisions which they contained.

Affirmed.