**DODGE BROS., Inc., v. UNITED STATES.**

Nos. 6406, 6424, 6425, 6431.

District Court, D. Maryland.

May 22, 1940.

314

Larkin, Rathbone & Perry, John W. Drye, Jr., and T. R. Iserman, all of New York City, Hershey, Donaldson, Williams & Stanley, Albert E. Donaldson, Raymond S. Williams, and Richard W. Emory, all of Baltimore, Md., for plaintiff.

Samuel O. Clark, Jr., Asst. Atty. Gen., Andrew D. Sharpe, Milford S. Zimmerman, and Arthur L. Jacobs, Sp. Assts. to Atty. Gen., and Bernard J. Flynn, U. S. Atty., and G. Randolph Aiken, Asst. U. S. Atty., both of Baltimore, Md., for defendant.

CHESNUT, District Judge.

In these four suits the plaintiff, Dodge Brothers, Inc., a Maryland corporation heretofore engaged in the manufacture and sale of automobiles, is seeking recovery of alleged overpayments of income taxes for the years 1925 to 1928, both inclusive. Different amounts are claimed for the several years but the aggregate is $2,366,630.-72 with interest. The contention of the plaintiff is that the overpayments resulted from the refusal of the Commissioner of Internal Revenue to allow as deductions from gross income for the respective years

two items; (1) the amount of $10,000,000 for depreciation (in the nature of obsolescence) over the four-year period on an item of intangible property consisting of what is called the "proved Dodge car"; and (2) amortization of bond discount over the four-year period in the aggregate amount of $811,026.41.

The evidence in the case consists principally of a lengthy and elaborate stipulation of facts supplemented by some oral testimony. The stipulation of facts gives in much detail the history of the manufacture and sale of the Dodge four-cylinder automobile from 1914 to 1928, and the financial and legal history of the several successive legal entities which owned and operated it. Stripped of unessential details this history may be succinctly summarized.

Prior to 1914 John F. Dodge and Horace E. Dodge as partners were engaged in Detroit, Michigan, in the manufacture of parts for the Ford automobile. In that year they withdrew from that particular business and determined to manufacture and sell an automobile of their own make. Their business was incorporated in Michigan on July 7, 1914, and until their respective deaths in 1920, they wholly owned and personally managed the business of the corporation which consisted principally of the manufacture and sale of the Dodge four-cylinder car. After their deaths the stock was owned by their respective estates and the business continued in that ownership until May 1, 1925, when all the assets of the business consisting principally of factory and equipment at Hamtranck, Michigan, was sold for $146,000,000 in cash to a syndicate of bankers headed by Dillon, Read & Co., of New York. The latter organized a Maryland corporation named Dodge Brothers, Inc., and caused all the assets of the Michigan corporation to be conveyed to the Maryland corporation in exchange for securities issued by it to the syndicate of bankers consisting of—

(a) $75,000,000 principal amount of 6% Gold Debentures, due May 1, 1940;

(b) 850,000 shares of preference stock (each share of preference stock carrying with it one share of common stock Class A);

(c) 650,000 shares of common stock Class A;

(d) 500,000 shares of common stock Class B (having sole voting power) and

(e) $14,000,000 in cash. This cash was paid by the Maryland corporation from the assets of the Michigan corporation transferred to it.

The securities so issued by the Maryland corporation comprised all of the securities authorized by its charter with the exception of 1,035,000 shares of Class A common stock which was reserved specifically for the conversion of the debentures into common stock. The Maryland corporation assumed all the liabilities of the Michigan corporation. As of May 1, 1925, the fair market value of all the assets (including good-will at $1.00 only) was $105,133,160.-40, and the excess of assets over liabilities (excluding debentures and stock issued) was $81,913,473.62.

The bankers organized several separate syndicates for the sale of the debentures and most of the stock to the public. Shortly thereafter the public market value of all the securities which had been issued by the Maryland corporation aggregated about $190,000,000. The banking syndicates realized a profit of over $20,000,000 in addition to the retention of some of the stock. Dillon, Read & Co., and its associate, United States & Foreign Securities Corporation, retained 472,000 shares of the Class B common stock, which alone had voting power; and six of seven directors of the Maryland corporation were persons formerly associated with Dillon, Read & Co.

The net profits of the Michigan corporation for five years prior to 1925 averaged about $12,000,000. For 1924 the amount was over $17,000,000; and for 1925 the aggregate profits of the Michigan and Maryland corporations were over $22,000,-000; the net profits for the Maryland corporation for 1926 were $21,591,919.43, and for 1927 were $9,641,426.62; and for the six months of 1928 were $3,400,443.57. During 1927 it became apparent to the management of Dodge Brothers, Inc., that the great popularity of the Dodge four-cylinder car for ten years past was fast waning despite substantial improvements which were made therein and very extensive advertising. It thereupon decided to bring out a new six-cylinder car as a supplementary line to the four-cylinder car; but several successive six-cylinder models were comparatively unsuccessful; and as of June 30, 1928, the whole business was sold to the Chrysler Corporation, also largely engaged in the manufacture and sale of motor cars. The transaction took the form of an exchange of Chrysler stock for Dodge stock in the proportions of 1 share of Chrysler for 1 share of Dodge preference stock; 1 share of Chrysler for 5 shares of Dodge Class A common stock and 1 share of Chrysler for 10 shares of Dodge Class B common stock. It is said that at then prevailing market prices for the Chrysler stock the original purchasers of Dodge stock did not sustain a loss. Chrysler assumed the liability of the debentures, all of which have now been retired either by conversion through the sinking fund or called and paid off by Chrysler at a premium. All the assets of the Maryland corporation were conveyed to the Chrysler corporation which has since continued the business of manufacture and sale of Dodge cars. The corporate identity of the Maryland corporation has been continued but it has engaged in no active business since July 30, 1928. Income tax returns were duly made by the Maryland corporation for the years 1925 to 1928 inclusive, and the total amount of taxes shown thereon aggregating about $6,500,000 were duly paid. In none of these returns was any claim made by the taxpayer for deduction on account of the items of depreciation and amortization of bond discount here involved. In the current course of audit of the taxpayer's returns by the Commissioner various corrections and adjustments were made resulting in a determination by the Commissioner of a deficiency for 1925 in the amount of $477,647.95, and over-assessment for 1926, 1927 and 1928 in the aggregate amount of $922,198.99. In the course of negotiations between the taxpayer and the Commissioner the additional claims for deductions involved in this case were advanced on behalf of the taxpayer for the first time in December 1928. The theory of the deduction as to depreciation for obsolescence of the so-called "proved car" was then first formulated by the accountant for the taxpayer, a Mr. Bailey of the firm of Ernst & Ernst. The term "proved car" has no historical or technical significance in the automotive industry. The phrase was coined by Mr. Bailey as a convenient expression of his conception of an intangible item of value which he thought was capable of separate valuation and segregation from the collective item of good-will which had been valued on the books of the taxpayer at $1.00. The Commissioner rejected the contention that the

item was properly depreciable, and also rejected the contention for deduction for amortization of debenture discount. Appropriate petitions for refund were in due course made, filed and rejected, and these suits have resulted. No question of limitations is presented except in one possible aspect of the cases which is not necessary to the decision.

### Plaintiff's Contention as to Depreciation.

The Revenue Act of 1926, c. 27, 44 Stat. 9, § 234(a), 26 U.S.C.A. Int.Rev.Acts, pages 185, 187, reads:

"In computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions: * * *

"(7) A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence."[1]

There have long been Treasury Regulations relating to depreciation allowances in the determination of income taxes.[2] The one most applicable here reads as follows:

"Art. 163. *Depreciation of intangible property.*—Intangibles, the use of which in the trade or business is definitely limited in duration, may be subject to a depreciation allowance. Examples are patents and copyrights, licenses, and franchises. Intangibles, the use of which in the business or trade is not so limited, will not usually be a proper subject of such an allowance. If, however, an intangible asset acquired *through capital outlay* is known from experience to be of value in the business for only a limited period, the length of which can be estimated from experience with *reasonable certainty,* such intangible asset may be the subject of a depreciation allowance, provided the facts are fully shown in the return or prior

thereto to the satisfaction of the Commissioner. *No deduction for depreciation, including obsolescence, is allowable in respect of good will.*"[3] (Italics supplied)

This Regulation has long been in force. The income tax statutes have frequently been reenacted since the publication of the Regulation. No challenge as to its validity is here made by counsel for the taxpayer.[4]

The contention of the taxpayer is that the Dodge four-cylinder car made and sold from 1914 to 1925 had characteristics which readily distinguished it in the popular mind from other makes of cars, and had acquired a very favorable public reputation which enabled its manufacturers to enjoy large profits. The chief of these characteristics was its uniform shape and appearance over a period of ten years, and its generally sturdy and reliable performance, although it was comparatively lacking in grace and symmetry of body line and was rather rough riding. It was characterized by its chief advertising slogan—"Constant Improvement—No Yearly Models". In this respect it rather resembled the Model-T Ford which had a relatively uniform road appearance from 1908 to 1927, and to some extent also the Packard automobile which for many years has preserved a comparatively uniform radiator and hood design. In the stipulation of facts (paragraph 38) the term "Dodge car" as used in these cases was defined "to mean the four-cylinder passenger automobile (including all parts, chassis and accessories appurtenant thereto whether used in passenger or commercial vehicles or trucks) manufactured and sold by Dodge Brothers and by Dodge Brothers, Inc." It is this model or design of the Dodge car which is in this case called the "proved car"; by which is meant that the particular model and design, comparatively uniform in ap-

---

[1] The Revenue Act of 1928, c. 852, 45 Stat. 791, § 23, 26 U.S.C.A. Int.Rev.Acts, pages 356, 358, is similar. It provides: "In computing net income there shall be allowed as deductions: * * *
"(k) Depreciation. A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence."

[2] See Treasury Regulations 69 relating to income taxes under the Revenue Act of 1926. Articles 161, 162, and 163 deal specifically with the depreciation of intangible property.

[3] It is stated in the brief of counsel for the Government in this case that:
"The italicized final sentence of Article 163 was the result of an amendment of August 5, 1927, by Treasury Decision 4055, VI-2, Cum.Bull. 63. That Treasury Decision merely was a specific declaration of the already existing interpretation by the Commissioner."

[4] United States v. Cerecedo Hermanos y Compania, 209 U.S. 337, 339, 28 S.Ct. 532, 52 L.Ed. 821; McCaughn v. Hershey Choc. Co., 283 U.S. 488, 492, 51 S.Ct. 510, 75 L.Ed. 1183; Murphy Oil Co. v. Burnet, 287 U.S. 299, 307, 53 S.Ct. 161, 77 L.Ed. 318.

pearance over the period of years, although the automobile was constantly and currently improved in detail, had been *approved and accepted by the public*. It was also a low priced car selling, in the body style known as the touring car, for about $800.

It will have been noted that the banking syndicate paid $146,000,000 in cash to the Michigan corporation for its assets subject to its liabilities, and that these assets were conveyed directly by the Michigan corporation to the Maryland corporation, which paid therefor to the bankers $14,000,000 in cash from the current assets received from the Michigan corporation, and also issued its securities in the amounts mentioned to the bankers. After paying out $14,000,000 the fair market value of the assets received by the Maryland corporation was about $82,000,000 in excess of liabilities assumed. Included in the assets acquired by the Maryland corporation was the item of good-will carried on the books at $1.00. It is therefore pointed out by the plaintiff that, measured by the cash transaction, the real value of the item of good-will carried at only $1.00 on the books, must have been approximately $50,000,000. The theory advanced by the taxpayer's accountant is that the bookkeeping item denominated simply "good-will" must be analyzed into its component parts, the principal elements of which were the trade name of "Dodge", the very valuable dealers' organization for the sale and distribution of the Dodge cars, the earning impetus from the accumulated effect of prior expenditures of about $12,000,000 for national advertising, and the "proved car" itself. It is further contended that considering these several component parts of the whole item of good-will valued at $50,000,000, the fair valuation of the "proved car" would be at least $10,000,000. There was oral testimony (which will be further considered later) consisting of opinion evidence to this effect. It is the taxpayer's contention that as of May 1, 1925 advances and improvements in the automotive industry clearly foreshadowed the necessity of abandonment of the manufacture of the four-cylinder car within the then near future, by reason of the growing popular demand for a six-cylinder car in approximately the price class of the Dodge four-cylinder car. In other words, the taxpayer's contention here, consistent with the requirements of the Treasury Regulation above quoted, is that the "proved car" as

intangible property is properly depreciable because it was acquired "through capital outlay", and it was "known from experience to be of value in the business for only a limited period, the length of which could be estimated from experience with reasonable certainty."

In the words of the statute a deduction from income is allowable only with respect to "property". What is allowed is a reasonable sum for exhaustion, wear and tear. These words are obviously inapplicable to intangible property; but the statute also allows a deduction for *obsolescence* which, under certain conditions, may be properly applied to some forms of intangible property. This is recognized by the Regulations which point out that the justification for the allowance is the loss to the taxpayer of value by physical wear and tear on tangible property, and gradual diminution in value from obsolescence due to the normal progress of an art, "as where machinery or other property must be replaced by new inventions, or due to the inadequacy of the property to the growing needs of the business". As to intangibles, the Regulation expressly limits depreciation to those "the use of which in the trade or business *is definitely limited in duration*." Familiar examples are patents, copyrights, licenses and franchises, and the Regulation adds, "intangibles, the use of which in the business or trade is not so limited, will not usually be a proper subject of such an allowance." And the Regulation concludes in this respect by saying that "no deduction for depreciation, including obsolescence, is allowable in respect of good-will". And so the courts have held in a number of cases. Clarke v. Haberle Crystal Springs Brewing Co., 280 U.S. 384, 50 S.Ct. 155, 74 L.Ed. 498; Red Wing Malting Co. v. Willcuts, 8 Cir., 15 F.2d 626, 49 A.L.R. 459; United States v. Hardy, 4 Cir. 74 F.2d 841. One reason for the rule is that good-will has no determinable economic life apart from the business as a going concern. It ordinarily is *not* assignable apart from the business to which it applies. It continues in varying value as long as the business.

 It is thus apparent that the taxpayer, to prevail in its present contention, must affirmatively show (a) that the so-called "proved car" constitutes an item of intangible property which, though included on the taxpayer's books under the term of good-will, is in fact distinct and severable

from good-will; (b) that this item of property was acquired by the Maryland corporation through a capital outlay; (c) the amount of which can be fairly determined by allocation from a lump sum consideration paid for all the assets and (d) that the nature of the item of property is such that it was known from experience to be of value in the business for only a limited period, the length of which could be estimated with reasonable certainty. Upon consideration of the evidence, I have reached the conclusion of law that the taxpayer has not established any one of these four required elements of proof.

■ If it be assumed that the taxpayer's conception of what constituted the "proved car" may be regarded as intrinsically an item of intangible property, it is really inseparable from good-will in this case. It is important, of course, to have clearly in mind what the "proved car" really is. The term does not refer to any particular tangible automobile but only to the design or model of an automobile. The expression really denotes not the actual product made but rather the qualities of that product in popular estimation; or, in other words, it means that the public approved the Dodge four-cylinder car as evidenced by its purchase in large quantities over a period of years. The fact that the Dodge corporation as a going concern put out a product which had enjoyed popular approval for a period of years of course gave promise that under unchanged conditions it would continue to have large net profits which would be realized through the continued popular approval and purchase of the same product. But this is only the long accepted legal meaning of the term "good-will" which, as was said by Lord Eldon in Cruttwell v. Lye, 17 Ves. 335, 346, is "nothing more than the probability that the old customers will resort to the old place". Furthermore the conditions in the past which have produced substantial profits and which are assumed would continue to exist in the future included, in addition to the qualities of the product itself, the business organization of the Dodge Company consisting of its manufacturing facilities for mass production at low unit cost; retail sales and distributing organizations on a national and indeed even international basis; the trade name of "Dodge" under which its products were sold; and the accumulated impetus derived from extensive national advertising. All these several

matters were important constituent elements of good-will. If any one of them had been severed from the business it is problematical whether the changed conditions would have produced continued large net profits. Thus the particular automobile model would not have been readily saleable except under the trade name of "Dodge"; nor could it have been widely sold if the then existing retail sales distributors organization had been destroyed; nor could it have been made and sold at a profit if the factory organization had been dispersed, until a new one had been assembled. In this respect the several constituent elements co-existing and constituting good-will were in the nature of a chemical composition rather than merely a physical compound. For this reason the conception of the "proved car" was in my opinion, not a properly depreciable asset.

■ But even if it could be concluded that the "proved car" was intrinsically properly a subject for depreciation, other conditions for the allowable deduction for obsolescence have not been shown. The evidence does not satisfactorily establish what was the capital outlay made by the Maryland corporation in acquiring the proved Dodge model as a part of the whole business. The taxpayer contends that at least $50,000,000 was paid for all elements of good-will, and that at least $10,000,000 of this amount should be allocated to the proved automobile model. At once we are faced with the fact that in setting up its own books the taxpayer included all elements of good-will at only $1.00. It is said that, as other items of net assets could and were on the books valued at $82,000,-000, and as the assets cost the bankers $132,000,000 net ($146,000,000 less $14,-000,000), there must necessarily have been paid in cash $50,000,000 for good-will. It is to be noted, however, that the Maryland corporation did not buy the assets from the Michigan corporation but from the bankers, and what it gave the bankers in exchange for the assets was not cash (except to the extent of $14,000,000) but securities. There was no allocation at that time of any particular portion or amount of the securities to good-will or any other item of the assets. As a practical and legal matter, what was done was to issue a block of securities for the whole of a going business; and doubtless the amount and nature of the securities issued was proportionate to the bankers' estimate of the

probable continued earning power of the business. Even if we could disregard the securities and treat the transaction as in substance a cash payment from the Maryland to the Michigan corporation, there is still no reasonable justification for allocating $10,000,000 of cash to the "proved car" item. It is not even suggested that any person involved in the three-cornered transaction made any such allocation either expressly or impliedly at that time. Nor is there any satisfactory evidence in this case that the valuation of $10,000,000, or any other definite amount, represented the fair valuation of the "proved car" in 1925. It is true the taxpayer has submitted the opinion evidence of three or four witnesses of long experience in the automotive industry that the value of the "proved car" was not less than $10,000,000; but the reasons on which these opinions are based show very clearly, I think, that the valuation is mere speculation and in the legal sense arbitrary. Furthermore it is by no means clear from the testimony of these witnesses just what they conceive to be the item of property referred to as the "proved car". In some cases, at least, their testimony seemed to indicate that they were thinking in terms of the net earnings of the business resulting from the several constituent elements of good-will rather than the isolated conception of the model of the car itself. Thus one of the witnesses, Mr. Young, conceded that the model of the car would be of only nominal value without the right to make and sell it under the trade name of "Dodge". I therefore am unable to find from the evidence in the case that the "proved car" as of May 1, 1925, had, intrinsically and isolated from other features of good-will, any definitely ascertainable value.

██ ██ The taxpayer concedes that it is necessary for it to show that in 1925 the "proved car" had a definitely terminable useful life; but it is contended that if that is shown it is merely a question of fact to be determined in this case from the evidence what was the length of this life and the depreciation rate would then be adjusted accordingly. On this point the Regulation provides that "the length of the limited period of usefulness must be capable of estimation from experience with reasonable certainty". I cannot find from the evidence in this case that this requirement of the Regulation has been met. On the contrary there are many facts set out in the stipulation which tend strongly to show that in 1925, and indeed until the latter part of 1927, there was no reasonable certainty that the four-cylinder car model would have to be abandoned in the near future. It is true that for some years prior to 1925 there was a very definite trend in the industry to six-cylinder models. In the higher priced cars the six-cylinder model was not uncommon, and there was a popular demand for the six-cylinder model in the lower price class. The management of the Michigan corporation had considered as early as 1923 substituting a six-cylinder model for its four-cylinder car but had definitely decided against doing so. Through 1924 and 1925, the net profits on the manufacture and sale of the four-cylinder car increased, and substantially held the increase through 1926. In 1926 the Dodge four-cylinder car reached the peak of its production and distribution, the corporation having made and sold 264,471 four-cylinder cars, representing 6.65% of the output of the whole industry for the year, and having also produced and sold 37,463 four-cylinder Graham commercial cars and trucks, using the same model engine for the latter which became a subsidiary company. Despite the large increase in the automotive industry the Dodge was well holding its relative percentage of output which, from 1924 to 1926, had never been more than 6.90% of the whole industry. And in the year 1926 four-cylinder cars still represented 64% of all motor cars made and sold. Even in 1927, 129,000 Dodge passenger automobiles were sold, and there was a large increase in the sale of the Graham four-cylinder trucks which in that year amounted to 53,834. The final decision of the Dodge management to substitute a six-cylinder car for its four-cylinder model came rather suddenly toward the end of 1927, and was apparently due to the insistent demand of its retail distributors. It is also to be noted that Chrysler put out a new four-cylinder passenger automobile even after it had bought the Dodge business, and had brought out a Dodge six-cylinder car; and Chrysler continued to make and sell Graham trucks with the Dodge four-cylinder motor until 1932. In 1930 the proportion of four-cylinder cars to all cars was 44.5%; in 1931, 33.3%; and in 1932, 17.9%. It is of course true that now the industry has practically abandoned four-cylinder cars for six or eight-cylinder cars

for both passenger and commercial use, and at the present time, with the advantage of hindsight, it is now possible to say that in 1925 the utility of the four-cylinder model had a terminable life in the sense that it was becoming obsolescent. But it is a very different thing to say, as is required by the Regulation, that it was known in 1925 from prior experience that this would be the case. The evidence also shows that as late as 1926 and 1927 the Dodge management was assuring its distributors and the public that it had no intention of abandoning the four-cylinder model; when it made its first six-cylinder model it was added merely as a supplementary line; and the management continued to make very determined efforts, by substantial improvements in the four-cylinder car and by extensive advertising, to continue its popularity. The conclusion of fact that I reach from the evidence on this point is that in 1925 it was not possible to determine with any reasonable certainty that the continued economic life of the Dodge four-cylinder car was necessarily limited to some definite period in the future, as, for instance, to two or ten years. It is argued for the taxpayer that, if it was reasonably certain the useful economic life would be limited as to time, the only remaining problem is to determine the maximum time even if that is difficult. I take the view, however, that the spirit as well as the fair meaning of the words used in the Regulation require the ascertainment of the probable duration of economic life with reasonable certainty, and not merely within such widely variable limits as two to ten years.

■ ■ The taxpayer must also show what is the salvage value of the depreciated property at the end of its useful economic life.[5] There is no sufficiently definite evidence in this case to determine the salvage value of the "proved car" in 1928. It is true that the four-cylinder model was abandoned in that year for passenger cars, but it continued to be used by Chrysler for trucks until 1932. An important part of the business of manufacturing automobiles is the continued supply of new parts for old cars. The physical life of a Dodge four-cylinder car is said to have been about eight years. The parts business for these cars was continued for some years by Chrysler. If the "proved car" was otherwise properly depreciable it would still be necessary to determine its salvage value remaining in 1928.

The stipulated facts also show that the cost to Dodge Brothers, the Michigan corporation, in the development of the four-cylinder model up to 1925 was about $2,600,000, all of which, however, was charged to expense in operations and deducted from income tax returns, and none of it was capitalized. The facts also show that the taxpayer has been allowed deductions from income in all these cases for all depreciation due to wear and tear on or obsolescence of tangible property both real and personal, including particularly depreciation at the rate of 40% on the special tools, jigs, fixtures, dies, drawings, patterns and models used in the manufacture of the four-cylinder car. For the years 1926, 27, 28, the Commissioner, in the course of negotiations over the audit, allowed deductions for depreciation in the aggregate amount of nearly $5,000,000 more than was originally claimed by the taxpayer in its income tax returns. We are not concerned on this point with that feature of the income tax laws which allows deduction for "loss" sustained in any year by the taxpayer due to the abandonment or writing off of capital assets which have become valueless. See United States v. Hardy, 4 Cir. 74 F.2d 841; Renziehausen v. Lucas, 280 U.S. 387, 50 S.Ct. 156, 74 L.Ed. 501.

■ ■ The fact that the taxpayer did not set up or make claims for the depreciable allowance now contended for in its original returns until December 1928, is not conclusive against its present contention, but is quite strongly indicative of the fact, which indeed is not disputed, that its present contention did not as a practical matter occur to any one in its management at the time. Furthermore none of its executives in 1925 to 1928 have been called as witnesses in this case to give ev-

---

[5] See Regulations 69, Art. 161:
"The proper allowance for such depreciation of any property used in the trade or business is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate), whereby the aggregate of the amounts so set aside, plus the salvage value will at the end of the useful life of the property in the business, equal the basis of the property determined in accordance with section 204 of Articles 1591–1603".

idence with respect to their then views as to the terminable economic life of the four-cylinder model. The Regulations, Article 169, also require that the depreciation allowance must be charged off on the books, and should be computed with reference to specific items or groups of property, and the taxpayer should keep such appropriate records thereof as will permit the ready verification of the factors used in computing the allowance for each item, unit or group. These requirements were not complied with by the taxpayer, and at least now impose upon it a much heavier burden of adducing satisfactory evidence of the propriety of the deductions at this late date. Still again Article 166 of the Regulations, dealing with obsolescence as affecting physical property, provides that "no deduction for obsolescence will be permitted merely because, in the opinion of the taxpayer, the property *may* become obsolete at some later date. This allowance will be confined to such portion of the property on which obsolescence is definitely shown to be sustained and can not be held applicable to an entire property unless all portions thereof are affected by the conditions to which obsolescence is found to be due." In a very recent case (Real Estate-Land Title & Trust Co. v. United States, 309 U.S. 13, 60 S.Ct. 371, 84 L.Ed. ——) the Supreme Court has pointed out that the obsolescence which may be charged off with respect to tangible property is narrower in application than the general understanding of the word. It was there said that in general obsolescence under the Act connotes functional depreciation.

Counsel for the taxpayer has cited only one prior decision in support of its present contention. Essex Motors v. Commissioner, 22 B.T.A. 804. In that case there was definite proof to show that the fair value of a design or model for an automobile was $400,000, and that its useful economic life was three years. The allowance was made on "the design and working model of [the Essex automobile], together with all patterns, tools, dies, jigs, and blue prints". Counsel for the taxpayer here contends that the full record of the case, apart from the official report, shows that the sole issue presented as stated by Government counsel in that case was "the value of this model and design for depreciation purposes". And the taxpayer's counsel stated that they would not attempt to prove any value for the tools and other items, but rested on the proof of the working model and design. The model involved was for a new car which had not then been sold and approved by the public. Assuming without comment that the case was properly decided, it is readily distinguishable on the facts from the present case. In the opinion it was said: "No contention was advanced as to the right to depreciation of the property in question".

*The amortization of bond or debenture discount* when allowable, is treated in income tax accounting as additional interest, and is based on the authority of the sections of the law which permit the deduction from gross income of interest paid or accrued within the taxable year on indebtedness, and for "losses" sustained during the taxable year and not compensated for by insurance or otherwise.[6] With respect to bond discount the Treasury Regulations provide that it is to be treated in the same way as interest paid; the net amount of the discount is deductible and should be pro rated or amortized over the life of the bonds.[7]

■ The taxpayer contends that it should be determined from the evidence that its $75,000,000 principal amount of 6% sinking fund gold debentures were issued at a discount of 5% of their face value; and that this discount in the amount of $3,750,000 should be amortized by deduction from the gross income over the four-year period in the aggregate amount of $811,126.41. It is sufficient answer to this contention that the evidence very clearly establishes that the debentures were not in fact issued at a discount. The Maryland corporation acquired the Dodge property in exchange for $14,000,000 in cash, $75,000,000 par value of 6% debentures, certain preferred and common stocks and the assumption of liabilities. $14,000,000 cash was paid from the larger item of cash received from the Michigan corporation, and, deducting that sum, the fair value of the assets over liabilities was approximately $82,000,000, excluding the item

---

[6] Revenue Act of 1926, c. 27, 44 Stat. 9, § 234(a) (2) (4), 26 U.S.C.A. Int.Rev. Acts, page 186; Revenue Act of 1928, c. 852, 45 Stat. 791, § 23 (b) (f), 26 U.S.C. A. Int.Rev.Acts, pages 356, 357.

[7] See Regulations 69, Arts. 545, 563; Regulations 74, Art. 68(3) (a); Art. 176.

of good-will. The legal financial transaction both in form and substance was that the Michigan corporation sold its whole business to the bankers for $146,000,000 in cash; and the bankers in turn sold the business to the Maryland corporation for cash, debentures and stock. The bankers re-sold the debentures and stock, other than that retained by them, to the public at a net profit of over $20,000,000 in addition to the retained stock. As the fair value of the assets received by the taxpayer, even excluding good-will, was in excess of the par value of the debentures, it is difficult to see how it can be contended that the debentures were issued at a discount. The taxpayer's contention to the contrary is based on an hypothesis only. The contention for the discount is put forward on two alternative theories. First, it is said that *if* the debentures had been issued by the taxpayer for cash, a 5% bankers' charge in 1925 would have been normal and customary; and in this connection it is pointed out that the debentures were in fact sold by the bankers to the public at 99; a commission of 3% was also paid to selling agents, and in addition thereto, 1% underwriting commission would have been quite reasonable. But the Maryland corporation had no part in all this. There was no expense whatever to the taxpayer in the transaction except the incidental printing or engraving charges for its securities which were deducted by it as an expense in income tax accounting. The bankers acquired the securities as owners, and whatever expense they incurred in the re-sale to the public was deducted by them in their individual income tax accounting. They were not acting as agents for the corporation but as independent operators.

In the alternative the taxpayer contends that if it cannot be allowed a proper debenture discount of $3,750,000, then the discount should be determined to be $23,551,178.40. This is said to be the "portion allocable to said debentures of the difference between the value of the property received for all of its securities, i. e., $132,000,000, and the fair market value of said securities, i. e., $190,500,000, and that said allocation is in accordance with the Revenue Acts of 1926 and 28". On this theory the taxpayer contends that the total amount of amortization to which it is entitled for the four-year period is $5,093,500.20. The theory here seems to be that the cost and fair value of the Dodge assets, including good-will, was $132,000,000 ($146,000,000, less $14,000,000) while the market value of the securities after sale to the public by the bankers was $190,500,000, and that the difference between the former and latter figures, to wit, $58,500,000, should be proportionately distributed over the debentures and stocks resulting in an alleged discount of $23,551,178.40 for the $75,000,000 debentures. The theory is obviously untenable for a number of reasons. The market quotations for some of the securities (*after* issuance by the corporation) is not necessarily a fair measure of value for the aggregate of all the securities when first issued. Nor was the taxpayer directly concerned in what the bankers realized from the re-sale of its securities issued to them as owners. If the bankers had been acting in any legal sense as agents for the Maryland corporation, the latter ought to have been entitled to the large resulting profit, for which, of course, there is no contention here. Furthermore if it be assumed that the aggregate value of the securities in the hands of the public was $190,500,000, and the net value of the assets received by the taxpayer only $132,000,000, there is still no legal basis for allocating any part of the difference between the two sums to the debentures, the holders of which as creditors would have been entitled to distribution preferential to the stockholders in the event of liquidation. Case v. Los Angeles Lumber Co., 308 U.S. 106, 115, 60 S.Ct. 1, 84 L.Ed. 110. Two cases are cited by counsel for the taxpayer in support of its contention for this allocation. Hummell-Ross Fibre Corp. v. Commissioner, 4 Cir., 79 F.2d 474, and Pierce Oil Corp. v. Commissioner, 32 B.T.A. 403, 419, 420. Both cases are clearly distinguishable on the facts as in them the securities were issued for cash and not for property. In the Hummell case, a going corporation sold a new issue of bonds plus some treasury stock of definitely ascertainable value for a sum equal to the par value of the bonds. The Board of Tax Appeals, 31 B.T.A. 451, determined that the value of the stock was $40 per share and allowed the aggregate amount of that value to be treated as the amount of the bond discount. The Court of Appeals approved this finding.

The basis on which bond discount is permitted to be deducted from gross income in income tax accounting is that it

constitutes in effect additional interest over the rates specified in the bonds, and is thus an added expense in the conduct of business. When interest bearing bonds or debentures, the principal of which is payable in the future, are issued for *money* in an amount less than the principal of the bonds or debentures, it is obvious that the borrower will sustain a definite and certain loss, if it remains solvent, in the amount of the difference between the sum received and the principal value of the obligation. The difference is commonly called discount and when amortized over the life of the bond issue is in effect added interest. The Treasury Regulations recognize this and permit amortization in proper amount, and this practice has been definitely approved in many court cases. Helvering v. Union Pac. R. Co., 293 U.S. 282, 55 S.Ct. 165, 79 L.Ed. 363; American Gas & Elec. Co. v. Commissioner, 2 Cir., 85 F.2d 527, 529, 530; Western Maryland Ry. Co. v. Commissioner, 4 Cir., 33 F.2d 695, 697; San Joaquin Light & Power Corp. v. McLaughlin, 9 Cir., 65 F.2d 677, 679. But when, as in this case, the bonds are issued for *property* a different situation results, because in that case it is not certain whether the transaction will involve a loss until the property so acquired is disposed of. The only immediate tax effect is to fix the cost basis of the property to the taxpayer. The income tax law is ordinarily concerned only with realized losses and gains. Lucas v. American Code Co., 280 U.S. 445, 449, 50 S.Ct. 202, 74 L.Ed. 538, 67 A.L.R. 1010; Burnet v. Huff, 288 U.S. 156, 53 S.Ct. 330, 77 L.Ed. 670; United States v. S. S. White Dental Co., 274 U.S. 398, 401, 47 S.Ct. 598, 71 L.Ed. 1120; Weiss v. Wiener, 279 U.S. 333, 335, 49 S.Ct. 337, 73 L.Ed. 720. Counsel have not been able to refer me to any decided cases allowing amortization of alleged bond discount where the bonds were issued for property and not for cash.[8] It is at least doubtful whether bond discount can be amortized in any case where the bonds are issued for tangible property (at least prior to final disposition of the property). There seems to be no express decision on this point although a number of cases cited for the defendant tend to negative the proposition. New York, C. & St. L. R. Co. v. Commissioner, 23 B.T.A. 177, 196, affirmed 62 App.D.C. 29, 64 F.2d 152, 154; Southern Ry. Co. v. Commissioner, 27 B.T.A. 673, 689, affirmed in part and reversed in part on other grounds, 4 Cir., 74 F.2d 887. It is, however, unnecessary to decide that point in this case because the evidence clearly shows that the value of the property received was materially in excess of the face amount of the debentures; and the issuance of the stock along with the debentures for the property does not warrant an allocation of any discount to the debentures as in the Pierce Oil and Hummel-Fibre cases, supra, where bonds and stock were issued for cash.

I conclude, therefore, that the taxpayer in these cases is not entitled to a deduction for amortization of debenture discount.

For these reasons I have granted the defendant's motion for judgment. The clerk will enter judgment for the defendant with costs.

---

[8] Counsel for the taxpayer refer to a Treasury Office Decision, 959, reported in Cum.Bull. 4, p. 129, January to June 1921, to the effect that if bonds were issued for property having a fair market value less than the par value of the bonds, the latter may be treated as issued at a discount equal to the difference. It does not appear, however, there has ever been any Treasury Regulation to this effect or that there has been consistent practice in the Department in accordance with that decision.