## MONTANA POWER CO.
### v.
### UNITED STATES.
#### Civ. A. No. 159–52.

United States District Court
D. New Jersey.
May 17, 1954.

Schmid & Bourne, by Coleman Burke, Summitt, N. J., E. Roy Gilpin, George E. Bailey, New York City, for plaintiff.

William F. Tompkins, U. S. Atty., Newark, N. J., by Herman Scott, Asst. U. S. Atty., Passaic, N. J., John A. Rees, Sp. Asst., Dept. of Justice, Washington, D. C., for defendant.

HARTSHORNE, District Judge.

The question in this case is whether or not the debentures of plaintiff Montana Power, "Montana", were issued at a discount, and, if so, whether or not such discount is to be determined and deducted in Montana's income and excess profits tax returns, according to the principle laid down in American Smelting & Refining Co. v. United States, 3 Cir., 1942, 130 F.2d 883. The pertinent principle stated in that case is that, in ascertaining the existence of bond discount for Federal tax purposes the discount is "the difference [between] the par value of [the] bonds and the fair market value" of that which is received by the issuer of the bonds in return therefor, whether same be cash or property. Montana claims, because the situation in the case at bar was that of a tax-free reorganization, which was not

the case in American Smelting, that in ascertaining the existence of a bond discount and its amount, it is not the "fair market value" of the property received for the bonds, or debentures on the reorganization transfer, which should be used, but the "adjusted basis for determining the gain or loss" on a sale of the property,[1] which should be used. Defendant Government insists that the American Smelting rule is fully applicable, and that, in any event, the debentures in fact were not issued at a discount. We turn to the facts, here stipulated for the decision of the Court sitting without a jury.

### Facts

American Power & Light, "American", a holding company which in 1931 had acquired natural gas properties in Montana, in 1932 transferred these properties to Montana Power Gas Co., "Gas Company", in return for the Gas Company's issuance of all its stock to American, whereby it became American's wholly-owned subsidiary. In 1936 Gas Company, still controlled by American, transferred these properties to plaintiff Montana, also stock-controlled by American. This transfer was paid for by Montana's 30-year 5% debentures, of which $10,589,900 in par were issued for that purpose and turned over to Gas Company. This transaction constituted a tax-free reorganization, as a consequence of which the parties agree that the "adjusted basis" of said assets (the gas properties) in the hands of Montana immediately after said exchange, was the same adjusted basis which said assets had in the hands of Gas Company immediately prior to said exchange, to wit, some $7,000,000. It should be noted that the above "adjusted basis" of the gas property refers under the statute, not to the then value of the debentures or any discount thereon, but to the method of determining capital gains or loss on a subsequent sale of the

gas properties which has not yet occurred, and may never occur.[2] In fact, there is no reference in the Revenue Act itself to debenture, or bond, discount, and the right to deduct it on the payment of income or excess profits taxes. The only reference thereto is in the Regulations of the Bureau of Internal Revenue, which the parties admit have the force of law, to the effect that

"If bonds are issued by a corporation at a discount the net amount of such discount is deductible and should be prorated or amortized over the life of the bonds." 1949 Ed. C.F.R. Title 26 Internal Revenue, Sec. 29.22(a)–17(c)(1).

That such a bond discount is to be deducted and amortized is recognized by American Smelting, as based upon Helvering v. Union Pacific R. Co., 1934, 293 U.S. 282, 55 S.Ct. 165, 79 L.Ed. 363.

The above tax-free reorganization transfer of the gas properties by Gas Company to Montana, and the payment therefor by Montana's above debentures, was under a plan submitted to and approved by the Federal Power Commission, which embodied in its approval, and in the above agreement of transfer between the Gas Company and Montana, the following condition:

"It is understood that if the cost to American Power & Light Company (American) as provided in said order of the Federal Power Commission is not established, you (Gas Company) will return to us (Montana) such amount of debentures as shall be in excess of said cost so established." (Parentheses the Court's.)

In the stipulation of facts the cost of such gas properties on the books of the Gas Company, as received from its parent company, American, and transferred to Montana, similarly controlled by American, is itemized (Exhibit A) as amounting to some $11,000,000, sub-

---

1. Revenue Act 1936, Tit. 26, U.S.C.A. Internal Revenue Acts, §§ 111(a), 113 (b), pages 854, 865.

2. See note 3, infra.

stantially the par value of the debentures. In the stipulated "statement of assets and liabilities transferred November 30, 1936 by Montana Power Gas Company to the Montana Power Company under plan of reorganization"—the transfer for which the debentures were issued—the net value of such assets is stated as $10,589,900. This is the exact amount of the par value of the debentures issued by Montana and turned over to Gas Company on the transfer in question. (Stipulation, Exhibit E, Schedule N, Sheet a–28.) In 1945, nine years after the issue of the debentures, though twenty-one years before they matured, Montana retired these debentures by paying in cash, to certain banks, their par value—$10,589,900.

Such being the facts, Montana claims its above debentures were issued at a discount, and that such discount should be calculated by subtracting from the par value of its debentures $10,589,900—not the "fair market value" at that time of the gas properties it purchased therewith, but the "adjusted basis" at that time of such gas properties, as fixed for determining gain or loss on any subsequent sale, i. e., some $7,000,000. This difference, some $3,000,000, when amortized over the 30-year life of the bonds, under Union Pacific and American Smelting, as Montana thinks they should be modified to meet its circumstances, would thus entitle Montana to a deduction of some $118,000 a year on the taxes in question. It consequently sues, in three separate causes of action, for the return of this amount which it allegedly was unlawfully compelled to pay defendant, because of defendant's failure to permit it to take the above deductions, on its income tax for 1940, on its income tax for 1941, and on its excess profits tax for 1941. Defendant denies Montana's right thereto.

## Law

We of course take as settled law the principles laid down in both Union Pacific and American Smelting, as above, that the issuance of bonds, or debentures, at a discount, requires the deduction of such discount under the Federal Revenue Acts, this deduction to be amortized over the life of the debentures; and further that the amount of the discount is the difference between the par value of the debentures and the fair market value of that which the issuer of the debentures receives in return therefor, whether this be cash or property. Furthermore, American Smelting holds that "the burden was upon him (the taxpayer) to make this showing" (to prove the discount) 130 F.2d at page 886. The first question thus is, whether Montana has met this burden of proving that its debentures were issued at a discount.

Here we note the following facts: (1) On the transfer of the gas properties by Gas Company in 1936 to Montana, their cost on the books of the Gas Company was some $11,000,000—substantially the par value of the debentures. (2) Montana itself, in its income tax return for 1936, swore that the net value of these properties as so transferred to it was $10,589,900, the exact par value of the above debentures. (3) The Federal Power Commission conditioned its approval of this transfer to Montana, upon Montana's arranging to obtain the return from Gas Company, both being subsidiaries of American, of any excess of the par value of the debentures over the cost of the gas properties to American, the holding company of both Gas Company and Montana. That not only the Federal Power Commission, but Montana, as well as Gas Company and American, considered this cost to American to be the cost to Gas Company, and thereafter to Montana, is evident also from the fact that the issuance of Montana's debentures · were conditioned thereon, and that such condition was embodied in the contract between Gas Company and Montana governing the transfer in question. (4) No such debentures have been returned. This is proven by the fact that nine years thereafter this entire issue of debentures was retired. (5) Thus, not only American, but its subsidiaries, Gas Company and Mon-

tana, have apparently insisted over the years that this cost of these gas properties to American, and to Montana, was a fair cost—the fair market value of the property at that time. (6) Twenty-one years before the maturity of these debentures, Montana, instead of retiring them at a discount, retired them by paying for them dollar for dollar at par.

All these facts indicate that the actual "fair market value" of these gas properties, when transferred to Montana in return for Montana's debentures, was probably not some $7,000,000, as Montana claims in its complaint, but was at least $10,589,900, the par value of such debentures. In any event, under the rule laid down in American Smelting, Montana clearly has not borne the burden of proving that the debentures in question were issued at a discount. Thus the action of the Collector in refusing to allow Montana the claimed deduction was in accord with the law as laid down in American Smelting.

Montana claims, however, that the above rule in American Smelting must be modified when it is applied to tax-free reorganization situations such as the present, this on the theory that tax inequities may otherwise result, or as American Smelting puts it, theoretically only and not as a fact, "the balance of the tax situation" may be upset, 130 F.2d at page 885. Our inquiry thus is, whether the application of the rule stated in American Smelting to tax-free reorganization cases will result in such glaring tax inequities as to clearly indicate that what is bond discount in such cases differs from what is bond discount in all other cases.

Montana must freely admit that no words of Congress in the 1936 tax act or of the Regulations expressly so indicate. We therefore turn to the purpose of the Congress, as generally expressed in its words in such Act, in (1) providing for tax-free reorganizations and (2) providing for the "adjusted basis" of corporate assets, to see if that purpose requires the Court to disregard the words used.

As to reorganizations, the Revenue Act of 1936 contains a series of provisions, all of which, so far as claimed by Montana, deal not with bond issues, bond discounts, and their amortization, but with capital gains or losses on the sales of property, as such gains or losses are to be considered in computing net income. The Act in its provisions as to considering gain or loss on a sale of property, provides, Sec. 112(g):

"As used in this section and section 113–(1) The term 'reorganization' means * * * (C) a transfer by a corporation (Gas Company) of all or a part of its assets to another corporation (Montana) if immediately after the transfer the transferor (Gas Company) or its stockholders (American) or both are in control of the corporation to which the assets are transferred (Montana)." 26 U.S.C.A.Int.Rev. Acts, page 858. (Parentheses the Court's.)

It is agreed that this fits the facts here. The same section of the Act further provides

"(a) General rule. Upon the sale or exchange of property the entire amount of the gain or loss, * * shall be recognized, except as hereinafter provided in this section.

"(b) Exchanges solely in kind
* * * * * *

"(4) No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization." 26 U.S.C.A.Int.Rev.Acts, page 855.

This it is agreed also applies to the case at bar.

Therefrom it is clear that while ordinarily, when property is sold or exchanged, the gain or loss thereon is to be determined in connection with computing net income, no such gain or loss is to be considered on a transfer for reorganization purposes such as the pres-

ent. The reason for this is made even more clear by the further provision of the Act where, in speaking of the "adjusted basis for determining the gain or loss" on the ordinary sale or exchange of property, the Act provides that, under circumstances stipulated to be the same as the present " * * * The basis shall be the same as it would be in the hands of the transferor * * *." Sec. 113(a)(7), 26 U.S.C.A.Int.Rev.Acts, pages 859, 862. In short, when corporation A, controlled by stockholder X, turns over property to corporation B, also controlled by stockholder X, in return for the securities of B, the situation is simply a friendly arrangement for business convenience, where the equitable owners of the property take it out of one pocket and put it in another. Here, so far as the interests of the corporations are concerned in the property in question, the one corporation simply steps into the shoes of the other. In such a situation, says the Congress, where the same property still remains under the same control, and the transaction has been simply one of business convenience, it would be unfair to claim there had been income to the party or parties, in control of this paper transaction. Both parties agree to this, quoting a series of Congressional Reports as to the purpose of the insertion of the corporate reorganization provisions in the act, Sec. 112(b)(4), Sec. 113(a)(7), supra.

"The underlying principle behind all of the exchange and reorganiza-

tion provisions of the present law is that they do not result in tax exemption, but that the tax is postponed until a gain is realized from a pure sale or what amounts to a pure sale * * *. Normal business adjustments will not be interfered with if so-called 'paper profits' are exempted." Report of Ways and Means Subcommittee relating to the 1934 Act, 73rd Cong. 2d Sess. H. Report December 4, 1933.

Compare Helvering v. Cement Investors, 1942, 316 U.S. 527, 533, 62 S.Ct. 1125, 86 L.Ed. 1649. Note, however, that this simply defers the taxation of a gain or loss from the time when the transfer is a mere change in the form of ownership, till the time when such gain or loss is in fact realized.

But in all fairness, since Montana here simply steps into the shoes of Gas Company, the gas properties' valuation, for the purpose of computing gain or loss on any ordinary sale by Montana subsequent to the reorganization transfer, should be the same in the hands of Montana as it was in the hands of Gas Company, as the act states. Sec. 113(a) (7). Thereupon the act goes on to provide how, on any possible ultimate sale by Montana to third parties, the gain or loss on such sale should be · determined with respect to computing the net income of Montana on such later date.[3] This accordingly, as in the case of every other normal sale, would be "the cost

---

**3.** The Revenue Act 1936, U.S.C.A. Title 26 provides in Sec. 111(a) under the heading "Determination of Amount of, and Recognition of, Gain or Loss" in the "Computation of Net Income", that "The gain from the sale * * * shall be the excess of the amount realized therefrom over the adjusted basis provided in section 113(b) for determining gain * * *." The Act further provides "The adjusted basis for determining the gain or loss from the sale * * *, shall be the basis determined under subsection (a) (Sec. 113), adjusted * * * (for exhaustion, depletion, etc.)." Section 113 (b).

Section 113, subsection (a) provides "The basis of property shall be the cost of such property; except that * * * (under a tax-free reorganization as here) the basis shall be the same as it would be in the hands of the transferor * * *." Section 113(a) (7). The parties agree that the balance of the above subsection is immaterial since the Act further provides "No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization". Section 112(b) (4). (Parentheses the Court's.)

of such property" as "adjusted" for expenditures such as depreciation and depletion, as particularly applicable to gas properties. This adjustment for depreciation or depletion, i. e., the using up of the gas itself, is of substantial benefit to the property owner, here Gas Company, since Gas Company is thus permitted under the act to deduct annually the amount of this depletion on its income tax return. As a result of these annual deductions from its taxes in the past, Gas Company, at the time of the above reorganization transfer to Montana, carried these gas properties, not at cost of $10,589,900, but at the "adjusted basis" of some $7,000,000. Thus Montana, stepping into the shoes of Gas Company, must similarly carry these gas properties at the "adjusted basis" of some $7,000,000 *for the same purposes,* i. e., for the purpose of taking further depletion deductions or for the purpose of computing gain or loss on a possible sale later to third parties.

But this matter of Montana's later taking the benefit of further deductions for depletion or of computing gain or loss on a later sale to third parties, which may never occur, is a very different matter from the question now being considered, i. e., as to whether Montana can now claim an *additional* tax benefit, on the issuance of its debentures at an alleged discount upon this present tax-free reorganization.

As to each such matter it is, in the end, the facts that count. As to the matter of the issuance of the debentures at a discount, since, in fact, all concerned apparently considered that the gas properties received for the debentures were then worth their par value, $10,589,900, there simply was no discount in fact. As to the other matter, of Montana's taking depletion on the gas properties hereafter, or of computing gain or loss on a sale hereafter, there is nothing inequitable in making Montana take the adjusted basis of some $7,000,-000. This is because Gas Company, into whose shoes Montana stepped, by their joint choice, had already taken the bene-

fit, through depletion and other deductions, of the difference between the actual value of these gas properties, $10,-589,900, and their adjusted basis of some $7,000,000. Montana could hardly ask to take these deductions all over again.

As to the supposititious capital gain, which Montana may hereafter show on a later sale to third parties, and which will never occur if Montana itself develops these gas properties, there is nothing unfair in compelling Montana to use the same basis therefor, which Gas Company, into whose shoes Montana stepped, must have used, had it not transferred such properties to Montana. Indeed, since this ultimate possible capital gain, or perchance loss, will be the same to Montana, which issued the debentures, as it would have been to Gas Company, if no transfer to Montana, and no issue of Montana's debentures, had occurred, clearly the debenture issue has no effect on this supposititious capital gain, and is a matter entirely separate therefrom. Similarly, hereafter Montana will be entitled to the same depreciation deduction—no more, no less— as would Gas Company, if no transfer from Gas Company to Montana had occurred and no debentures been issued.

Thus the allowance or disallowance of a bond discount has nothing to do with "the balance of the tax situation", so far as any later capital gain item, or depreciation item, is concerned.

It is the quite separate statutory provisions as to adjustment of the cost of property for depreciation, etc., which give rise to the supposititious tax inequity which Montana fears. But these provisions are not, and can hardly be, attacked by Montana, since they are of benefit both to Montana and Gas Company. Nor can weight be attached to Montana's claim as to the possibility of double taxation under Section 113(a)(6) of the Act. In the first place, Montana cannot claim it will be doubly taxed; only that such may be the effect as to Gas Company or American. Nor does Montana claim that, even considering

these third parties, such will in fact be the result. It merely alludes thereto as a theoretic possibility. Surely no such mere theoretic possibility, which Montana could easily establish, were it a fact, can suffice to prove that the Regulation, accepted by both parties as binding here, does not mean here what it means in all other cases.

Finally, Montana, Gas Company, and their holding company, American, must be presumed to know the law, even if they did not in fact, which seems doubtful. They decided to take advantage for their own benefit of this tax-free reorganization, which Congress permitted. Even had this reorganization worked out in other aspects to their disadvantage, it was they who made the decision in the light of the law. "The tail goes with the hide". They could not complain now, even were a tax disadvantage to counterbalance the advantage, which they chose to take. Founders General Corp. v. Hoey, 1937, 300 U.S. 268, 275, 57 S.Ct. 457, 81 L.Ed. 639; Old Mission Portland Cement Co. v. Helvering, 1934, 293 U.S. 289, 293, 55 S.Ct. 158, 79 L.Ed. 367; Healy v. Commissioner, 1953, 345 U.S. 278, 285, 73 S.Ct. 671, 97 L.Ed. 1007. And see Zonolite v. U. S., 7 Cir., 1954, 211 F.2d 508.

Nor is the Sacramento case, Sacramento Medico Dental Building Co. v. Commissioner of Internal Revenue, 1942, 47 B.T.A. 315 to the contrary. The situation dealt with here did not there arise in fact. Not only were the words of the Board in that regard *dictum*, but the Board did not even attempt to state any principle of law, in that regard, even as *dictum*. It merely indicated that on the non-existent case there suggested by the taxpayer, the taxpayer *might* have an argument—an argument now found fallacious.

Defendant, while admitting the jurisdiction of this Court, as to Montana's first and second causes of action, denies its jurisdiction as to its third cause of action, where it seeks recovery of the 1941 excess profits taxes, jurisdiction being based upon 28 U.S.C.A. § 1346(a) (1). But in view of the above decision on the merits, this question becomes academic, and will not be dealt with.

In short, the Collector has followed the settled law in applying same to the facts. If there be any tax difference, there is no inequity, since there is good reason for it. And this alleged difference, if it exists, does not affect Montana, but Gas Company and perhaps American. Furthermore, it arises, if at all, only because Montana joined with Gas Company and American in choosing the very course, which caused it, for their own advantage otherwise. Thus Montana cannot justly complain, and in any event, this tax difference is not so unreasonable and glaring as to show that the Regulations, which both sides accept as binding, do not mean here what they mean in all other cases.

The facts herein stated and the conclusions of law herein expressed shall be considered the findings of fact and the conclusions of law required by Fed.Rules Civ.Proc. rule 52, 28 U.S.C.A.

Unless Montana, within thirty days, shall apply to establish by further evidence the fair market value of the gas properties, at the time of their transfer to it by Gas Company, judgment will go for defendant.