The MONTANA POWER COMPANY, Appellant,

v.

UNITED STATES of America.

No. 11443.

United States Court of Appeals
Third Circuit.

Argued Feb. 21, 1955.

Reargued March 5, 1956.

Decided March 28, 1956.

E. Roy Gilpin, New York City (Schmid & Bourne, Summit, N. J., K. William Kolbe, New York City, on the brief), for appellant.

Walter Akerman, Jr., Washington, D. C. (Charles K. Rice, Acting Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., Raymond Del Tufo, Jr., U. S. Atty., Newark, N. J., H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Sp. Asst. to the Atty. Gen., on the brief), for the United States.

Before BIGGS, Chief Judge, and MARIS, GOODRICH, McLAUGHLIN, KALODNER, STALEY and HASTIE, Circuit Judges.

KALODNER, Circuit Judge.

Under long-standing Treasury Regulations a corporation which issues bonds at a discount can prorate or amortize such discount over the life of the bonds.

Sec. 19.22(a)-18(3) (a) of Treasury Regulations 103, applicable in the tax years here involved, provides:

"If bonds are issued by a corporation at a discount, the net amount of such discount is deductible and should be prorated or amortized over the life of the bonds."

The instant appeal involves the application of the aforementioned Treasury Regulations.

The undisputed facts, established by the record, may be summarized as follows:[1]

American Power & Light Company ("American") a public utility company, on November 30, 1936, owned 100 per cent of the stock of the Montana Power Gas Company ("Gas") and 99.75 per cent of the common stock of Montana Power Company ("taxpayer"). On the date mentioned, Gas transferred to taxpayer certain natural gas properties which it had acquired in December, 1932, from American[2] and received in payment for the transfer $10,589,900 principal amount of taxpayer's 30-year 5 per cent debentures. The transaction was a tax-free reorganization under a plan submitted to and approved by the Federal Power Commission, which embodied in its approval, and in the agreement of transfer between Gas and taxpayer, the specific condition that if the cost of the transferred property to American was not established Gas would return to taxpayer "such amount of said $10,589,900 principal amount of debentures as shall be in excess of said cost so established.[3] Taxpayer in its 1936 tax return scheduled the net value of the assigned assets at $10,589,900 in a "Statement of Assets and Liabilities Transferred November 30, 1936, by Montana Power Gas Company to the Montana Power Company under Plan of Reorganization" appended to the tax return. The cost to Gas of the transferred assets was $11,183,595.53.[4]

---

1. The facts are set forth in detail in the District Court's opinion reported at D.C. N.J.1954, 121 F.Supp. 577.

2. Gas had issued all of its outstanding capital stock to American in 1932 in payment for the gas properties.

3. The text of the provision follows:
   "It is understood that if the cost to American Power & Light Company as provided in said order of the Federal Power Commission is not established, you (Gas) will return to us (taxpayer) such amount of said $10,589,900 principal amount of debentures as shall be in excess of said cost so established."

4. Exhibit A—annexed to Stipulation of Facts.

In 1945, nine years after the debentures were issued, they were retired by taxpayer by payment of their principal amount of $10,589,900 to certain banks then in ownership. As an incident of the prior tax-free reorganization, under Section 113(a) (7) of the Revenue Act of 1936, 26 U.S.C.A.Int.Rev.Acts, page 863, taxpayer was required to take the same adjusted tax-cost basis for the assets acquired from Gas as they had in the latter's hands—$7,044,544.44.

Taxpayer claimed that it was entitled, under the Treasury Regulations, to a bond discount deduction of $3,545,355.56 —the difference between the tax-cost basis of the assets acquired from Gas and the principal amount of the debentures which it had issued in payment for them. It premised its claim upon the proposition that, where a non-taxable reorganization is involved, bond discount is determinable solely by reference to the transferor's adjusted basis for the property exchanged for the debentures, which the transferee, issuer of the debentures, is required to use.

The District Court rejected taxpayer's contention and held that under our decision in American Smelting & Refining Co. v. United States, 3 Cir., 1942, 130 F.2d 883, taxpayer could only be entitled to a discount if it could establish that the debentures in question exceeded the actual "fair market value" of the assets acquired from Gas. On consideration of the evidence adduced by taxpayer the District Court made the factual finding that it had failed to establish that the "actual fair market value" of the assets acquired by taxpayer was less than the total of the issued debentures; it ruled that "Unless Montana, within thirty days, shall apply to establish by further evidence the fair market value of the gas properties at the time of their transfer to it by Gas Company, judgment will go for defendant." Taxpayer having failed to act within the time fixed by the District Court, it dismissed its action and entered judgment for the United States. Taxpayer appealed.

On this appeal taxpayer has summarized its position as follows: "It was settled by American Smelting & Refining Co. v. United States * * * that discount may arise when debt is issued for property"; " * *. * the measure of said discount, when bonds are issued for property, is the difference between the *amount realized* and the principal amount of the debt"; " * * * the *amount realized* by the plaintiff (taxpayer) upon the issuance of its debentures is the tax-cost basis ($7,044,544.-44) of the gas properties received in exchange for plaintiff's (taxpayer's) debt, which basis the plaintiff (taxpayer) was required to use for all relevant purposes under the tax law"; "The fair market value of the properties is not relevant in this case" and finally, "The fact that certain of the transactions took place between affiliated corporations neither changes said result nor renders it inequitable".[5]

The sum of the government's position is that "the fallacy of the taxpayer's argument is that it rests upon the premise that all the taxpayer acquired for its bonds was a tax-basis, when, in fact, what the taxpayer acquired was property having a fair market value in no way related to the adjusted basis which the taxpayer was required to use solely because of its having chosen to participate in a non-taxable reorganization" and the taxpayer having failed to meet the burden of establishing, under the American Smelting decision, that the fair market value of the property acquired in exchange for the debentures was less than their principal amount is not entitled to a discount.

In the American Smelting case we laid down the rule that in instances where the discount regulation is applicable the taxpayer bears the burden of establishing that the fair market value of that for which the bonds were issued was less than their principal amount.

Here the taxpayer failed to introduce at the trial any evidence of the fair mar-

5. Page 16, Supplemental Brief for Appellant.

ket value of the property received in exchange ·for the debentures which it issued and it further failed to do so within the thirty-day grace period granted by the District Court.

The taxpayer urges that application of the "fair market value" doctrine "upsets the balance of the tax situation" because Gas was required to hold the debentures at $7,044,544.44 (tax-cost basis) and was thus subject to tax on the difference between that amount and the proceeds of the debentures, on disposition or retirement, while it, the taxpayer, could never recover more than $7,044,544.44 through deductions or depreciation or as an offset against the proceeds from re-sale of the property. In other words, says the taxpayer, the government would be directly taxing Gas on $3,545,355.56 (assuming that it realized the principal amount of the debentures) and would in effect tax it on an additional $3,545,355.56 in the manner above stated.

■ The District Court [121 F.Supp. 583] in dealing with this same contention observed that " 'The tail goes with the hide' "; that Gas, the taxpayer and their holding company, American, "must be presumed to know the law * * * they decided to take advantage for their own benefit of this tax-free reorganization * * * even had this reorganization worked out in other aspects to their disadvantage, it was they who made the decision in the light of the law" and "They could not complain now, even were a tax disadvantage to counterbalance the advantage, which they chose to take."

■ We agree with the District Court on this score. It is well-settled that a taxpayer is free to adopt such organization for his affairs as he may choose but having done so he must accept the tax consequence of his choice; this is so whether he contemplated such consequence or not.[6] And on that score it must be noted that allowance of deductions does not turn upon general equitable considerations and that such allowance "depends upon legislative grace; and only as there is clear provision therefor can any particular deduction be allowed." [7]

We should like to note, however, that in our view the result reached is not inequitable in the instant situation. During the four years that Gas owned the assets which it transferred to the taxpayer in November, 1936, it had, using round figures, reduced their cost basis by approximately $4,000,000, from $11,000,-000 to $7,000,000, via depreciation and depletion allowances, amortization of lease costs and capitalization development costs. The deductions, of course, reduced Gas' annual income taxes during the years in which they were taken. American, as parent of Gas and taxpayer, could have avoided the "balance of tax" dilemma of which taxpayer complains had it caused the latter to issue debentures for $7,000,000, the tax-cost basis of the transferred assets. However, instead, indulging in practices all too prevalent in the free-booter days of the holding company era, in a Tinker-to-Evers-to-Chance play, American arranged to have the taxpayer pay, again using round figures, $10,500,000 (in debentures) for assets which had a tax-cost basis of $7,000,000 utilizing the reorganization revenue statute to make it all tax-free. And then, American (in 1937) liquidated Gas into it and became the direct owner of taxpayer's debentures.[8] By the steps taken, American, assuming eventual realization in full of the principal amount of the debentures

6. Old Mission Portland Cement Co. v. Helvering, 1934, 293 U.S. 289, 293, 55 S.Ct. 158, 79 L.Ed. 367; Founders General Co. v. Hoey, 1937, 300 U.S. 268, 275, 57 S.Ct. 457, 81 L.Ed. 639; Higgins v. Smith, 1940, 308 U.S. 473, 477, 60 S.Ct. 355, 84 L.Ed. 406.

7. New Colonial Ice Co. v. Helvering, 1934, 292 U.S. 435, 440, 54 S.Ct. 788, 790, 78 L.Ed. 1348; Deputy v. DuPont, 1940, 308 U.S. 488, 493, 60 S.Ct. 363, 84 L.Ed. 416.

8. Taxpayer in its Supplemental Brief called this fact to the attention of the Court.

netted a neat $3,500,000 profit, subject only to payment of a 25 per cent capital gains tax. Incidentally, as earlier stated, the record discloses that the debentures were retired in 1945 by payment in full to two banks which then held them. No evidence was introduced below as to the purchase price paid by the banks to American for the debentures. However, it may be noted that the taxpayer in presenting its "balance of tax" contention has premised it on the supposition that American would be required to pay a capital gains tax on $3,500,000, which, of course, would only be so if it had realized the principal amount of the debentures in their sale to the banks.

While the taxpayer urges that "The principal issue involves the plaintiff as a separate taxable entity and does not transcend corporate lines to other companies which are separate taxable entities in and of themselves" [9] it incongruously argues, in its "balance of tax" contention, the tax consequence to both it and American. In doing so taxpayer has asked us in effect to look into the treasury chests of two corporations but not to pierce or penetrate the corporate veils of either in doing so.

Well, even a passing glance reveals that American, via taxpayer, seeks to achieve the storied aim of "getting the cake and keeping the penny too"; it wants its $3,500,000 profit (less capital gains tax) and its $3,500,000 discount too. To that we say, we just can't go along.

One final comment. The taxpayer's "balance of tax" contention stressing its loss of a $3,500,000 source of deductions should its "discount" plea fail, ignores the fact that a corporation, such as the taxpayer, operating natural gas-producing properties, would be entitled to percentage depletion deductions, which continue even after the entire capital investment has been recovered, and thus, it is possible that it may, in fact, be able to recover by way of depletion deductions an amount in excess of its entire debenture investment.

■ For the foregoing reasons all the members of the court except Chief Judge BIGGS agree that the taxpayer is not entitled to the relief it seeks in view of its failure to establish the fair market value of the property involved. We reach this conclusion without regard to the applicability of the discount regulation to the transaction, a question which a majority find it unnecessary to decide. Judge STALEY and the writer of this opinion, however, are of the view that this question should be considered and that its consideration supplies additional reasons for reaching the conclusion of the court that the judgment of the District Court should be affirmed. We think:

(1) The Treasury Regulations relating to bond "discount" are inapplicable in situations where bonds are issued in payment for property.

(2) Assuming applicability of the Treasury Regulations in cases where bonds are issued in payment for property, they cannot be invoked where there was no arms-length dealing, as was the case here.

On the score of the first point:

It must immediately be noted that the District Court, taxpayer and the United States have construed our decision in American Smelting & Refining Co. v. United States, supra, as a sweeping holding that under any and all circumstances bond discount may arise where debt obligations are issued for property.

In that case a corporation issued its bonds to retire a wholly-owned subsidiary's outstanding preferred stock and the contention was advanced that the principal amount of the bonds exceeded the market value of the preferred stock and that the excess constituted a "discount". The United States contended that "discount" arose only when bonds are issued for cash.

The specific ruling of this Court was "We believe that the discount is still to

___

9. Pages 8 and 9, Supplemental Brief of Appellant.

be treated as additional interest when the subject matter of the loan is stock instead of cash".[10]

It is true that in commenting on the government's contention we stated that "we do not think * * * that the question whether amortization is permitted is settled by making the dividing line between transactions in which bonds are issued for cash and transactions where bonds are issued for something else" but that comment must be considered in the light of the specific question presented for determination. The "something else" in that case was "preferred stock" of a wholly-owned subsidiary which the taxpayer retired in a recasting of its corporate structure— the issuance of bonds for preferred stock there was in substance a "funding operation" in which the taxpayer substituted for its preferred stock *liability* its bond *liability*. There was not in that case the issuance of bonds and attending creation of a liability in a purchase transaction for *investment* purposes as was true in this case. The American Smelting decision in that respect must be limited to its facts.

The question as to whether "discount" can arise where bonds are issued in payment for property has never been decided. On several occasions various courts have posed the question and left it unanswered because independent dispositive factors present in their cases made decision with respect to it unnecessary.

Coming now to the specific issue as to whether a "discount" can arise where bonds are issued in payment for property:

As we earlier stated here, and as we noted in the American Smelting case, the point has been raised in other cases, but the issue was avoided on the ground of lack of proof with respect to the value

of the property received by the taxpayer.[11]

It is interesting to note that in Dodge Bros. v. United States, D.C.Md.1940, 33 F.Supp. 312, 323, the District Court stated: "It is at least doubtful whether bond discount can be amortized in any case where the bonds are issued for tangible property (at least prior to final disposition of the property)", while on appeal the Court of Appeals for the Fourth Circuit, 1941, 118 F.2d 95, at page 103, said anent this question: " * * * we are not prepared to lay down any universal proposition that where bonds are issued for property, a reasonably estimated discount may never be taken as an amortized deduction." It may be observed parenthetically that in both courts it was held the question was not reached because of lack of proof that the bonds had been issued under circumstances which would be the equivalent of a "discount".

In the absence of a specific ruling on the issue we are compelled to explore such approach to the problem as may be indicated by cases in the general field relating to the Treasury Regulations here involved.

The provision as to deduction and amortization of bond discount first appeared in Article 150 of Treasury Regulations 33, promulgated under the Internal Revenue Code of 1916.

Captioned "Discount and expenses to be amortized", Article 150 provided in part:

> "In cases wherein a corporation *sells* its bonds at a discount plus a commission for *selling*, the amount of such discount and commission, together with other expenses incidental to issuing the bonds, constitutes a loss, the aggregate amount of which loss will, for the purpose of an income tax return, be prorated

---

10. American Smelting & Refining Co. v. United States, 3 Cir., 1942, 130 F.2d 883, 885.

11. Carding Gill, Ltd., v. Commissioner of Internal Revenue, 1938, 38 B.T.A. 669; Southern R. Co. v. Commissioner of Internal Revenue, 1933, 27 B.T.A. 673; New York, C. & St. L. R. Co. v. Commissioner of Internal Revenue, 1931, 23 B.T.A. 177; Kansas City S. R. Co. v. Commissioner of Internal Revenue, 1931, 22 B.T.A. 949.

over the life of *the bonds sold,* and the amount thus apportioned to each year will be deductible from the gross income of each such year until the bonds shall have been redeemed.

"If a corporation having *sold* its bonds at a discount, the discount having been deducted from gross income, later repurchases or redeems the bonds at a price less than par, the difference between the price at which they are redeemed and their par value will be returned as income. If bonds are *sold* at a premium, the premium must be returned as income." (Emphasis supplied.)

The form, but not the substance, of Article 150 was changed in Article 544 of Treasury Regulations 45 promulgated under the Internal Revenue Act of 1918, and succeeding Treasury Regulations pertaining to bond discount, including the Regulations here applicable, have been virtually identical with Article 544.

Article 544, captioned "Sale and retirement of corporate bonds", provided in part, in Sec. (3) (a) as follows:

"If bonds are issued by a corporation at a discount, the net amount of such discount is deductible as interest and should be prorated or amortized over the life of the bonds."

It may be observed that in Article 150 reference was made to the sale of bonds while in Article 544 the reference was to their issuance. That Article 544 meant to draw no distinction between selling and issuing is apparent from the specific provision in Article 563 of Treasury Regulations 45, captioned "Sale of capital stock, bonds and capital assets" that "If it (corporation) *sells* its bonds at a discount, the amount of such discount is treated as interest paid * * * See articles 544 and 848". Ar-

ticle 848, captioned "Surplus and undivided profits; discount on *sale* of bonds" provided in part: "Discount allowed on the *sale* of bonds is in effect an advance on account of interest * * *." (Emphasis supplied.)

It is thus apparent that from their inception the Treasury Regulations relating to "discount" contemplated that they were operative in situations where corporations "sold" bonds.[12]

In the leading cases of Helvering v. Union Pac. R. Co., 1934, 293 U.S. 282, 55 S.Ct. 165, 79 L.Ed. 363 and Old Mission Portland Cement Co. v. Helvering, 1934, 293 U.S. 289, 55 S.Ct. 158, 79 L.Ed. 367, the Supreme Court had occasion to construe and apply the Treasury Regulations relating to discount and the views which were therein expressed in general discussion of the Regulations are significantly illuminating with respect to the issue here presented.

Throughout the Union Pacific opinion the Supreme Court spoke of the *"funding operation"* involved in procuring capital by sale of bonds; of "the *capital realized* by the taxpayer from the *sale of the bonds"*, and "of the cost of the *borrowed capital".* (Emphasis suppled.)

Said the Court, 293 U.S. at page 286, 55 S.Ct. at page 167:

"Both commissions and discount * * * are factors in arriving at the actual amount of interest paid *for the use of capital procured by a bond issue.* The difference between the *capital realized by the issue* and par value, which is to be paid at maturity, must be added to the aggregate coupon payments in order to arrive at the total interest paid. Both discount and commissions are included in this difference. If the difference be viewed as a loss resulting from the *funding operation,* it is one which is realized only up-

12. See also Article 545(3) (a) of Treasury Regulations 62, 65 and 69; Article 68(3) (a) of Treasury Regulations 74 and 77; Article 22(a)–18(3) (a) of Treasury Regulations 86, 94 and 101; and Section 29.22(a)–17(3) (a) of Treasury Regulations 111. These Regulations were promulgated under the Revenue Acts of 1921, 1924, 1926, 1928, 1932, 1934, 1936 and 1938 and the Internal Revenue Code of 1939, respectively.

on the payment of the bonds at maturity." (Emphasis supplied.)

Significantly in this case the Supreme Court drew a distinction between capital "realized" by a bond issue and "the purchase of property". It said, 293 U. S. at page 287, 55 S.Ct. at page 167:

"Here the commissions, when paid, were properly chargeable against capital, and reduced by their amount the *capital realized* by the taxpayer from the bond issue. They come out of the pocket of the taxpayer only on payment of the bonds at maturity. *But, unlike the purchase and sale of property,* the transaction contemplated from the beginning a fixed date, the due date of the bonds, at which the difference between the net amount of *capital realized upon the issue* and the par value of the bonds must be paid to bondholders by the taxpayer. We think that the revenue acts, as they have been interpreted by this Court and the treasury regulations upon this and related subjects, require that this difference between *receipts* and disbursements of the taxpayer should, in some form, enter into the computation of his taxable income. It is a loss to the taxpayer, definite as to its date and amount, and represents a part of the *cost of the borrowed capital* during each year of the life of the bond issue." (Emphasis supplied.)

In the Old Mission case the Supreme Court in discussing "bond discount" said, 293 U.S. at page 292, 55 S.Ct. at page 160:

"Amortized bond discount is deductible from the taxpayer's gross income only by way of anticipation of payment of the bonds at maturity. It is then that the taxpayer pays the difference, between the *amount* realized upon the *sale* of the

bonds and their par value, which is the subject of the amortization." (Emphasis supplied.)

It is patent from the foregoing that the Supreme Court viewed the Treasury Regulations as applicable only to situations where there was a "sale" of bonds to "procure capital" in the usual and customary course of a "funding operation."

Its view is in consonance with the established conception of "discount" as the difference between the amount received by the borrower and the principal amount of the indebtedness. Otherwise stated, "discount" is the difference between the par or face value of the bonds and their lower *cash* sale price.[13] It is a method of adjusting the actual cost of money; the difference between the money received and the par value of the obligation is regarded as added, albeit deferred, "interest" which the Treasury Regulations permit to be spread over the term of the obligation so as to reflect the actual annual cost of the money realized by the funding operation rather than the interest rate payable.

To hold that the "discount" Regulation is applicable in a situation where the bonds are issued in payment for property would do violence to the fundamental concept of the Regulations and their purpose. There is no rational theory upon which the difference in value of property acquired in exchange for bonds can be likened to additional interest.

When bonds are issued for property it is impossible to ascertain whether there will be a loss or gain until the property is sold, while when bonds are issued for cash "loss" by way of added or deferred interest is immediately ascertainable.

It is settled that when property is acquired by purchase the cost of the property is the measure of the investment.[14]

13. "Discount is the difference between the amount borrowed and the amount the corporation is obligated to pay at redemption or maturity." Montgomery's Federal Taxes, Vol. 1, Ch. 10, p. 711, Corporations and Partnerships.

14. LaBelle Iron Works v. United States, 1920, 256 U.S. 377, 41 S.Ct. 528, 65 L. Ed. 998; Consolidated Coke Co. v. Commissioner, 3 Cir., 1934, 70 F.2d 446, 447.

Bonds issued for property become invested capital, and since the income tax law is concerned only with realized losses and gains no taxable loss or gain occurs with respect to such capital until the property is sold. Further, under the revenue laws the loss or gain accrues during the year in which the sale takes place and there can be no amortization with respect to a loss or the "spreading" of a gain over the years during which the property was in ownership. To hold that the "discount" Regulations are applicable where bonds are issued in payment of property would make a shambles of the long-settled law that losses or gains accrue during the year in which the property is sold. Such a holding would be a drastic and unjustifiable piece of judicial tax legislation which would upset the balance of the tax structure established by the Congress.

In this connection it must be kept in mind that deductions, such as provided by the Treasury Regulations under consideration, are not a matter of right but a matter of legislative grace, and only where there is a clear, literal provision for such deduction will it be allowed.[15] The repeated promulgation of the discount provision in Treasury Regulations under successive internal revenue laws in substantially the same form is a persuasive indication that such regulation has the approval of Congress,[16] but such implied approval must necessarily be limited to the literal wording of the Regulations. This is particularly so in the instant situation since there is not now and there has not been in the past, any specific provision in the revenue laws dealing with the deduction for bond "discount."

As to the second point: can the discount Regulations be invoked where there was no arms-length dealing between seller and purchaser?

It is clear that they cannot. With this conclusion Judge HASTIE also agrees.

The underlying theory of discount is that it is an adjustment of the difference between the interest prescribed and the prevailing market rate for money. The concept of bond discount necessarily implies and requires that a transaction be negotiated in the open market subject to the exigencies of a competitive economy.

As stated by a leading accounting authority: Patton's "Accountants' Handbook", 3rd ed. 1946, page 947:

"  *   *   *  It is usually agreed that the essential explanation of the existence of discount is found in the fact that the stated or 'coupon' rate of interest attaching to the bond is less than *the market rate on comparable securities*. With this condition the investor is unwilling to pay the full maturity amount, and the price is set at a point which permits the earning of *the market rate*, including the discount factor. The price of the bond, in other words, is the present worth of the interest annuity provided and the maturity amount *at the market rate of interest* for the class of security involved". (Emphasis supplied.)

San Joaquin Light & Power Corporation v. McLaughlin, 9 Cir., 1933, 65 F.2d 677 is to the same effect. Said the court at page 679, of 65 F.2d:

"Discount, on the one hand, and premium, on the other, in case of a bond issue are merely a means of adjusting the transaction to the *current market rate for money based upon the credit of the debtor and the availability of money for lending by the creditor*. It is recognized by the rules of the Treasury Department and by the systems of accounting in vogue in corporate affairs that these items of premium or discount, as the case may be, are but methods of adjusting the actual cost

---

15. New Colonial Ice Co. v. Helvering, 1934, 292 U.S. 435, 54 S.Ct. 788, 78 L. Ed. 1348.

16. Murphy Oil Co. v. Burnet, 1932, 287 U.S. 299, 307, 53 S.Ct. 161, 77 L.Ed. 318.

of money * * *." (Emphasis supplied.)

In Dodge Brothers v. United States, 4 Cir., 1941, 118 F.2d 95, at page 103, the court specifically denied the taxpayer the benefit of the "discount" regulation on the ground that:

> "The circumstances surrounding appellant's original issuance of the securities are not typical of the circumstances that might compel a corporation to discount its securities in the effort to secure for them a ready market. As the facts later revealed, the buying public was only too willing to purchase the securities of appellant. Apparently no discount was necessary for the ready marketing of these securities. * * * It becomes incumbent upon us to look to the substance of a given transaction to see whether a discount, in the nature of additional interest, has actually been given by the issuing corporation, thus determining whether such discount comes within the amortization regulation."

(Emphasis supplied.)

Application of the principles above stated leads inevitably to the inescapable conclusion that there were not present in this case the essential ingredients of a bond "discount" situation within the purview of the Treasury Regulations.

Looking "to the substance" of the transaction as we are required to do we find no evidence to sustain a finding that the circumstances of the issuance of the debentures here involved were "typical of the circumstances that might compel a corporation to discount its securities in the effort to secure for them a ready market."

Here American owned 100 per cent of Gas and 99.75 per cent of the common stock of the taxpayer. This was a Tinker-to-Evers-to-Chance play made by members of the same team playing in their own private, fenced-off backyard. The amount of debentures issued, their interest rate and their term were all fixed by intramural arrangements among this tight little family group.

There was here no evidence that the "discount" claimed "was necessary for the ready marketing of these securities"; or "as a means of adjusting the transaction to the current rate for money based upon the credit of the debtor (taxpayer) and the availability of money for lending by the creditor (Gas)".

On the other hand there was evidence that the total of debentures issued by taxpayer was predicated on the actual "cost to American" of the assets which it acquired from Gas. The Federal Power Commission made its approval of the tax-free reorganization plan in which the taxpayer acquired Gas' assets subject to the specific requirement that the amount of debentures issued should not be in excess of the "cost to American" of such assets and the evidence further disclosed that American's cost was slightly in excess of $11,000,000 compared to the $10,589,900 debentures issued. The agreement of transfer between Gas and taxpayer specifically embodied the condition imposed by the Federal Power Commission.

The judgment of the District Court will be affirmed.

BIGGS, Chief Judge (dissenting in part, concurring in part).

The definition of discount which the majority enunciates here was rejected by this court in American Smelting & Refining Co. v. United States, 3 Cir., 1942, 130 F.2d 883. The theory that a "discount" cannot arise where bonds are issued in payment for property is contrary to our holding in American Smelting and finds no support in the Treasury Regulations.

In view of the importance of the question presented by this appeal, directly affecting corporate taxation generally, I think it desirable to repeat certain facts so that the reasons for my dissent may be clear. The taxpayer, The Montana Power Company (Power) seeks to recover from the United States amounts of increases in its 1940 and 1941 income and its 1941 excess profits taxes resulting from its failure to deduct as amor-

tized discount the difference between the principal amount of debentures issued by it and the lower tax basis of property acquired by it in a non-taxable corporate reorganization. The court below held that only the difference between the principal amount of the debentures and the fair market value of the property could be deducted as discount and that the market value of the property was not shown to be less than the face value of the debentures. See, D.C.1954, 121 F.Supp. 577.

In 1936, American Power and Light Company owned all of the stock of Montana Power Gas Company (Gas) and over ninety percent of the voting stock of the taxpayer, Power. In 1936 Gas transferred all of its assets, held by it at a tax basis of $7,044,544, to Power in exchange for five percent, thirty-year debentures in the principal amount of $10,589,900 issued by Power. On the completion of this transfer of assets, the transferee, Power, was controlled by the stockholder of the transferor, Gas, so that this transaction was a "reorganization" within the definition of Section 112(g) (1) (C) of the Revenue Act of 1936, 49 Stat. 1648, 26 U.S.C.A.Int.Rev. Acts, page 858, applicable here. Inasmuch as Gas exchanged property solely for the securities of Power pursuant to that reorganization, no gain or loss was cognizable under Section 112(b) (4) of that Act by reason of the transaction. Under Section 113(a) (6), the pertinent "basis" section, Gas was required to hold the debentures of Power at the same basis at which Gas had held the property transferred. Under Section 113(a) (7) Power was required to hold the property acquired from Gas at the same basis at which it had been held by Gas.

After this transaction was consummated, Gas was subject to a tax on the difference between what it received on the debentures and the basis of the property it exchanged for the debentures.[1] If Gas had received $10,589,900, the principal amount of the debentures, the difference between that amount and $7,044,544, the basis of the property transferred to Power, would be $3,545,356 ultimately taxable to Gas as a result of the non-taxable exchange. On the other hand, Power takes the $7,044,544 basis of Gas as its own basis for the property acquired. Power must employ this basis to compute its depreciation and its gain or loss on any future sale. Therefore, if the property acquired by Power has an actual market value equal to the $10,589,900 principal amount of the debentures, as the United States contends, there is a $3,545,356 difference between what can be gotten out of the property by Power and the tax basis of the property which is ultimately taxable to Power as a result of the non-taxable exchange.

It follows that if no tax adjustments be made, a tax on $7,090,712 ($3,545,356 on Gas + $3,545,356 on Power) may result from this non-taxable exchange. If this had been an ordinary taxable exchange, there could accrue a tax on only half that amount, $3,545,356, which would be imposed on Gas.

Power contends that it should be allowed to deduct yearly as discount, pursuant to Section 19.22(a)–18(3) (a) of T.R. 103, an amortized portion of the amount of $3,545,356, the difference between the principal amount of the debentures issued by it and the tax basis of the property acquired by it, to the end that a double tax may be avoided. Power's argument is that the reorganization provisions were not intended to double the tax accruing from a nominally non-taxable exchange but only to postpone the recognition of the usual tax.

---

1. Gas did dispose of the bonds. The parties' stipulation of fact number 7 says: "On November 26, 1945 plaintiff retired the aforesaid $10,589,900 principal amount of its 5% debentures originally issued in the said exchange of November 30, 1936, by making cash payment to the then holders thereof, The Chase National Bank of the City of New York and Bank of America National Trust and Savings Association, in the amount of $10,589,900, the full principal amount of said debentures."

552

The government's reply to this assertion is that the statute allows only that which is interest in the classic, economic sense to be deducted as discount. Since Power exchanged its debentures for the property of Gas which in value equalled or exceeded the principal or face amount of the debentures, the government contends that no such deductible discount arose.

Section 19.22(a)–18(3) (a) of Treasury Regulations 103, applicable in the years in question, provided that: "If bonds are issued by a corporation at a discount, the net amount of such discount is deductible and should be prorated or amortized over the life of the bonds." In American Smelting & Refining Co. v. United States, supra, 130 F.2d at page 885, we held that under the Regulation the excess of the principal amount of bonds over the fair market value of property for which the bonds were exchanged in a taxable transaction was deductible as discount. We said: "Thus, when the investor is paid the face amount of the bond at maturity, he is taxable for the difference between that sum and the cost of the bond. Here the cost of the bond is the fair market value of the stock [given for the bond] at the time the corporate obligations were exchanged. To sustain the government's contention, in view of these considerations, would be to say, in effect, that, on the same loan, the taxable 'interest' earned by the investor varies in amount and is computed as of a different time than the deductible 'interest' paid by the obligor. We think that this not only distorts, unnecessarily, the ordinary incidents of a commercial transaction but also upsets the balance of the tax situation."

In Sacramento Medico Dental Building Co. v. Commissioner, 1942, 47 B.T.A. 315, the Board of Tax Appeals antici-

pated by way of dictum a situation similar to that presented by this case, saying at page 329 of its opinion: "As petitioner [taxpayer] points out, if the basis for determining gain or loss upon the disposition of this property by petitioner had been held by us to be a sum considerably less than the face amount of the bonds issued by it in return for the property, as, for example, the amount bid for the property at the foreclosure sale or its fair market value at the time of such sale, then a strong argument might be made that inequities would result from the disallowance of discount amortization, since, upon a later disposition of the property for a sum equivalent to the face amount of the bonds, a fictitious profit would arise, which could only be offset by a previously allowed deduction on account of discount."

The reorganization provisions of the tax law under which this transaction was consummated were designed to postpone recognition of transactions between members of single economic units until there occurs a transaction outside the family circle.[2] See, Helvering v. Cement Investors, Inc., 1942, 316 U.S. 527, 62 S.Ct. 1125, 86 L.Ed. 1649. Since corporate affiliates have been regarded as single economic units in formulating tax laws to govern this type of transaction, it is desirable to consider the tax impact of such a transaction as that at bar on the whole economic unit. Here, unless some adjustment be made the whole economic unit suffers a tax on double the amount that would be taxable if this were the usual taxable exchange. Although it has been said "as to double taxation, when, though seemingly unfair, the purpose is plain, courts will not interfere", T. W. Phillips, Jr., Inc., v. Commissioner, 3 Cir., 1933, 63 F.2d 101, 102, no purpose to tax doubly is here apparent. Therefore, a "discount" deduction

2. " * * * Congress, recognizing that certain types of 'gains' which are constitutionally taxable as income do not truly represent a change in the economic status of the taxpayer, and being desirous, too, of preventing the writing off of paper losses, has provided that the recognition of such gains and losses be postponed to some future date." Jacobson and Johnson, "The Revenue Act of 1936: Pyramiding Gains and Losses Through 'Tax-Free' Exchanges," 14 N.Y.U.L.Q. Rev. 59, 60 (1936).

is properly allowable under our Smelting ruling and the Tax Court's Sacramento dictum as a means of avoiding the double tax. The deduction must be allowed to preserve that "balance of the tax situation" which we considered important in the Smelting decision and which I think is of equal import here. Whether or not this is an "interest" expense in the classic sense should not be controlling in determining its deductibility as discount. The tax law requires that in this particular type of transaction Power carry the property acquired at a lower figure for tax purposes than the principal amount of the debentures issued in exchange. This figure, as I have said, is the one that must be used in ascertaining the depreciation deduction on the property and the gain or loss on its sale and, taxwise, is equally applicable in computing the discount on the issue of the debentures for which the property was exchanged. The difference in the principal amount of the debentures issued and the tax basis of the property acquired should therefore in my view be deductible by Power as discount.

I am aware that this view of the term "discount" might not meet the approval of classic economists; but we are dealing here with a living company, not with an example in a text book. We have here a tax basis, strictly imposed by the Revenue Act; and an inequitable result may be reached, and an integrated tax structure may be demolished if that basis is not applied in this situation.

The United States argues that, even though Power may obtain a refund on its 1940 and 1941 income taxes on the basis of the discount deduction, the third cause of action for a refund of 1941 excess profits taxes on this basis cannot be maintained because the court lacks jurisdiction to adjudicate this claim. Section 1346, Title 28 U.S.C., in specifying the jurisdiction of the district courts in suits for tax refunds, provides: "(a) The district courts shall have original jurisdiction, concurrent with the Court of Claims, of: (1) Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws, (i) if the claim does not exceed $10,000 or (ii) even if the claim exceeds $10,000 if the collector of internal revenue by whom such tax, penalty or sum was collected is dead or is not in office as collector of internal revenue when such action is commenced."

In its third cause of action, Power alleges that payments on its 1941 excess profits tax were made on December 13, 1946 in the amount of $614,000, on May 24, 1948 in the amount of $151,487, and on June 22, 1948 in the amount of $85,-751, and on the basis of the discount deduction a refund of $71,070 is claimed on these payments of the 1941 excess profits tax. To sustain jurisdiction, Power alleges generally that the taxes in issue were collected by a Collector of Internal Revenue "who is not now in office" and avers particularly: "At all times from July 6, 1933 to June 30, 1947 Lewis Penwell was Collector of Internal Revenue for the District of Montana * * * Penwell resigned from the office of Collector of Internal Revenue for the District of Montana on or about June 30, 1947 and is not now in office as such Collector." Since the excess profits tax claim was brought against the United States for more than $10,000, it is necessary to determine whether the amount in issue was paid by the 1946 installment. If it was, jurisdiction on the court below was conferred by Section 1346 because the 1946 payment was made to a collector not now in office. On the other hand, if the excess profits tax claim was paid by the 1948 installments, there was no jurisdiction in the court below because those payments were not made to a collector not in office at the time of the suit.

In analogous situations it has been held that the actual overpayment of the tax is the significant factor in determin-

ing the attributes of refund claims. In Lewis v. Reynolds, 1932, 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293, the Supreme Court determined that a taxpayer was not entitled to a refund for a particular year until the entire tax for that year had in fact been overpaid. And in Blair v. United States ex rel. Birkenstock, 1926, 271 U.S. 348, 46 S.Ct. 506, 70 L.Ed. 983, it was held that the United States is not liable for interest until there actually has been an overpayment of taxes.

These decisions demonstrate that a tax may not be held to have been erroneously collected until there has been actual overpayment of the tax due for the period in question. If this rule is not applicable in this case, it is indeed difficult to formulate a standard for resolving the issue. There would be no justification for regarding the first payment equal to the amount of the claimed refund as determinative when all the tax due has not been paid, and any apportionment of the refund over the various payments would seem to be equally unwarranted. It is my conclusion, therefore, that a district court has no jurisdiction of a refund claim in excess of $10,000 against the United States until there has been an overpayment of the entire tax due to a collector who is not in office at the time of institution of the suit.

In reaching this conclusion I am not unmindful of the fact that Section 1346 (a) (1), Title 28 U.S.C. was amended on July 30, 1954, 68 Stat. 589. The amendment abolished the requirement that the Collector be out of office at the time of institution of a suit for refund in excess of $10,000. However, I regard this change as jurisdictional rather than remedial; and therefore in no event can the amendment have any application to a pending action such as this. Amalgamated Ass'n, etc., v. Southern Bus Lines, 5 Cir., 1949, 172 F.2d 946, 947.

I would reverse the judgment of the court below as to the first two causes of action with the direction to enter judgment thereon in favor of Power. I would vacate the judgment as to the third cause of action and direct the court below to dismiss that cause for want of jurisdiction.