CHICAGO NORTH SHORE AND MIL-WAUKEE RAILWAY COMPANY, Appellant,

v.

UNITED STATES of America, Appellee.

No. 14178.

United States Court of Appeals Seventh Circuit.

Jan. 16, 1964.

Probable Jurisdiction Noted March 9, 1964.

See 84 S.Ct. 798.

---

Melvan M. Jacobs, Chicago, Ill., Elden McFarland, Washington, D. C., Charles D. Leist, Chicago, Ill., for appellant.

Louis F. Oberdorfer, Asst. Atty. Gen., Karl Schmeidler, Attorney, Tax Division, U. S. Department of Justice, Washington, D. C., Frank E. McDonald, U. S. Atty., Chicago, Ill., Lee A. Jackson, Joseph Kovner, Attorneys, Department of Justice, Washington, D. C., James P.

O'Brien, U. S. Atty., of counsel, for appellee.

Before DUFFY, KNOCH and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

The Chicago North Shore and Milwaukee Railway Company brought this action for a refund of federal income taxes for the year 1945 in the amount of $198,276.-93, plus interest. The district court denied the refund. Plaintiff (identified as the Railway) is the successor in interest to the Chicago North Shore and Milwaukee Railroad Company (identified as the Railroad). The facts were stipulated.

The Railroad operated an electric interurban railroad between Chicago and Milwaukee. It was organized in 1924. It had to refinance its operations in 1932. In June of that year, the Railroad issued four collateral promissory notes due April 1, 1935, and bearing interest at 6% per annum, as follows:

To: Reconstruction Finance Corporation its note dated June 10, 1932, for $1,150,000, secured by $2,056,-000 principal amount of the Railroad Company's 5½% Series C First and Refunding Mortgage Gold Bonds, maturing April 1, 1956, with semi-annual interest coupons maturing subsequent to April 1, 1932 attached thereto.

To: Central Republic Trust Company its note dated April 1, 1932 for $545,980.58, secured by $666,000 principal amount of its above mentioned Series C bonds with semi-annual interest coupons maturing subsequent to April 1, 1932 attached.

(Central Republic Trust Company assigned its note together with the collateral to Reconstruction Finance Corporation.)

To: Commonwealth Subsidiary Corporation its note dated April 1, 1932 for $300,000 secured by $333,-000 principal amount of its 6% Series A and its 5½% Series B First and Refunding Mortgage Gold Bonds, maturing January 1, 1955 and April 1, 1956, respectively, with all semi-annual interest coupons maturing subsequent to June 30, 1932 attached.

To: Public Service Subsidiary Corporation its note dated April 1, 1932 for $300,000 secured by $333,-000 principal amount of its above mentioned Series A and Series B bonds with all semi-annual interest coupons maturing subsequent to June 30, 1932 attached.

Shortly thereafter, the Railroad was placed under an equity receivership. In 1942, the receivership proceeding was succeeded by a proceeding under Chapter X of the Bankruptcy Act. In 1943 and 1944, the bankruptcy court authorized the sale of the Railroad's bonds which secured the 1932 notes.

In December, 1943, $10,800 face amount of Series A Bonds and $77,200 face amount of Series B Bonds were sold for $20,240. In January, 1944, $45,000 principal amount of Series A Bonds were sold for $10,350. In June, 1944, the bankruptcy court gave one of the creditors full ownership of $200,000 face amount of Series A Bonds in extinction of all rights under the collateral notes which the bonds had previously secured. In January, 1944, $300,000 face amount of Series A Bonds and $33,000 of Series B Bonds were sold for $90,576.

Finally, in June, 1944, Reconstruction Finance Corporation petitioned the bankruptcy court for leave to sell the collateral (the bonds) which secured the promissory notes issued either directly to it or to Central Republic Trust Company and subsequently assigned to the R.F.C. The R.F.C. was authorized to sell $2,722,000 of face amount of Series C Bonds with coupons attached for $29 per $100 face value of the bonds. The sales of the collateral held by the R.F.C. were consummated in July, 1944. The proceeds, $900,000, were paid to the R.F.C. The trustee reported that the R.F.C. applied the proceeds to reduce interest accrued on the notes it held.

In April, 1946, a plan of reorganization of the Railroad was approved. The plan was put into effect and thereby a new company, the Railway, was formed. The assets of the Railroad were transferred to the Railway free of all liens and encumbrances, with certain exceptions such as an obligation by the Railway to pay taxes due the United States. With respect to the Railroad's obligations, the plan provided:

(1) For each $1,000 principal amount of First and Refunding Mortgage Gold Bonds, Series A, the Railway would issue 27.946 shares of common stock of the Railway and pay $195.62 in cash.

(2) For each $1,000 principal amount of First and Refunding Mortgage Gold Bonds, Series B, the Railway would issue 27.116 shares of common stock of the new company and pay $189.83 in cash.

(3) For each $1,000 principal amount of First and Refunding Mortgage Bonds, Series C, the Railway would issue 27.116 shares of common stock of the new company and pay $189.83 in cash.

(4) All of the claims of unsecured creditors were declared to be without value and not entitled to participate in the plan.

The Railroad used an accrual method of accounting; accordingly, annual deductions representing interest on the 1932 notes were taken on its federal income tax returns for the years 1932 through 1946 although such interest was never paid.

In its income tax return for 1944, the Railroad claimed a deduction as a result of the sale of the collateral (the bonds) in the amount of $4,185,029.07 (which it later reduced by $125,102.50 for bonds sold during the year 1943). The Railroad computed its deduction for 1944 as follows: It determined that $3,388,000 face amount of its bonds had been sold and that there had accrued $2,295,205.07 of unpaid bond interest, for a total amount of $5,683,205.07; that the bonds

(with interest coupons attached) had been sold for $1,021,166, and that $477,-010 of the Railroad's liabilities on a note had been extinguished for a total amount of $1,498,176, leaving a net balance (loss) of $4,185,029.07.

In its 1945 income tax return, the Railroad claimed a net operating loss deduction of $3,279,383.55 carried over from 1944. The district director of Internal Revenue disallowed the claimed deduction. Following negotiations and conferences, he assessed an additional income tax for 1945 in the amount of $144,208.-59. The basis for this determination was an allowance of one-half of the amount claimed as a deduction for the year 1944.

In January, 1953, the Railway paid the additional assessment together with interest thereon amounting to $54,068.-34, or a total of $198,276.93. It filed a claim for refund. The claim was rejected and the instant suit was filed in 1957. The case was tried in 1962 and the judgment of dismissal was entered in February, 1963.

I.

The Railway poses as the primary issue its contention that the net increase in liabilites ($4,185,029.07), sustained by the Railroad because of the sale of the collateral (the bonds) in 1943 and 1944, must be treated as an additional cost of the 1932 financing arrangement, and therefore, fully accruable and deductible as a business expense in 1944. The district judge in rejecting the Railway's contention held that the "loss [the difference between the bonds sold in 1944 plus twelve years of accrued coupon interest and the purchase price received] is to be viewed as traditional bond discount which under applicable principles and regulations of the Internal Revenue Code must be amortized over the life of the bonds."

The Railway argues that when the bonds were sold in 1944 all events had occurred to determine the exact amount of the Railroad's net additional liabilities resulting from its 1932 refinancing and its unconditional obligation to pay this amount. It says that the noteholders'

disposal of the Railroad's bonds in 1944 must be treated as if it were a sale of collateral which was deposited in 1932 as security for its notes issued at that time. In other words, it contends that had the notes been paid when due in 1935, the bonds would have been returned to the Railroad and cancelled; but since the notes were not paid, the sale of bonds in 1944 resulted in an expense of $4,185,-029.07 (the difference between the face amount of the bonds plus accrued interest and the sale price) which accrued as a fixed obligation at the time the bonds were sold.

To put the Railway's position even more in focus, we quote from its brief:

"In the present case it is obvious that the sale of the collateral bonds in 1944 was the last step in the integrated borrowing transaction which had its inception in 1932 when the promissory notes were issued and the bonds themselves were deposited as security therefor. It was in the earlier year 1932 that the railroad company first incurred the risk that the collateral might ulitimately have to be sold by its creditors at a substantial financial loss to itself—sale transactions that were eventually to establish the amount and fix the certainty of its loss beyond any possibility of recoupment and with no additional funds being made available for corporate purposes. It is therefore clear that the financial detriment suffered by the taxpayer in 1944 was *not* sustained in a separate and independent *funding operation* occurring in that year (i. e. in 1944), but directly and proximately resulted from a true funding operation undertaken by the taxpayer in 1932. In those circumstances the net additional liabilities accruing in 1944 necessarily represented an additional cost or expense of the loans obtained in the earlier year."

The answer to the Railway's contention must begin in actualities. First, the Railroad suffered no out-of-pocket loss or expense in 1944 as a result of the bond sale. Second, assuming that both the notes and bonds had eventually been paid by the Railroad sometime after 1944, the additional obligation representing the difference between the face amount of the bonds and the amount they were sold for would not have actually been paid until the bonds and coupons were retired and paid. There was no obligation to pay the bonds during the year 1944; therefore, there was no accrual of this additional "obligation" in that year.

■ To state the situation in different language, the sale of the bonds must be viewed for tax purposes as an issuance by the Railroad of its bonds at less than their face value. It is settled law that a taxpayer who is on an accrual basis may not deduct the difference between the face amount of the debt incurred and the amount received in the year it issues bonds, Helvering v. Union Pacific R. R., 293 U.S. 282, 55 S.Ct. 165, 79 L.Ed. 363 (1934), Old Mission Portland Cement Co. v. Helvering, 293 U.S. 289, 55 S.Ct. 158, 79 L.Ed. 367 (1934), although the amount of the discount may be amortized as a deductible item over the period between the date of sale and the maturity date. Old Mission, supra; Treasury Regulation 111 (1939 Code), Section 29.-22(a)–17.

■ We believe the district judge correctly rejected the Railway's contention by adopting the view that the 1944 transactions constituted a sale of the Railroad's bonds at a discount.

Even this view, although theoretically and legally correct, overlooks a reality that makes the Railway's position even more untenable than it appears. The Railroad was insolvent and in bankruptcy in 1944 when the bonds were sold. On the basis of this known fact, it was a certainty that the Railroad could not pay the principal or interest of the bonds. Accordingly, the Railroad did not meet even the primary assumption of the bond discount rule, namely, that an absolute liability to pay the face amount of the principal and interest of bonds at maturity is created at the time of their issu-

ance. Only legalistic make-believe permits us to say that the Railroad became "obligated" in 1944 to pay the face amount of bonds and interest coupons at their maturity.

The Railway argues that the bond discount rule applies only to a new funding operation, that is, where new capital is supplied, citing Montana Power Co. v. United States, 232 F.2d 541 (3d Cir. 1956), cert. denied, 352 U.S. 843, 77 S.Ct. 51, 1 L.Ed.2d 59 (1956), and that the 1944 transactions were not of that character. But, the bonds in the instant situation were not issued until 1944. They were held in deposit from 1932 until 1944 as security for the notes and, hence, did not constitute an outstanding indebtedness during that period. Therefore, as a matter of law they must be treated as a new funding transaction in 1944.

## II.

The Railway contends that if the Railroad was not entitled to a deduction in 1944 for the full amount of the difference between face amount of the bonds plus accrued interest and the amount received ($4,185,029.07), there are two alternative grounds for the requested refund. The first alternative issue, the Railway presents, is that it is entitled to deduct under Section 23(b) of the 1939 Code, 26 U.S.C. 1952 ed. § 23,[1] $2,295,205.07, representing the amount of interest coupons attached to the bonds for the period from 1932 to the date of sale in 1944. It argues that "even though the 1944 collateral bond sales be considered as a new and independent funding operation * * * still the matured interest obligation becoming due and payable in 1944 was deductible as a separate accrued item, and could not be amortized over the period remaining to the due date of the principal obligation."

The district judge ruled contrary and held "that the amount representing 12 years coupon interest * * * should be treated as a part of the principal amount of these bonds or as an additional cost and expense of issuing the bonds, and in either event, should be amortized over the same period as the bond discount.

The Supreme Court in Deputy v. du Pont, 308 U.S. 488, 498, 60 S.Ct. 363, 368, 84 L.Ed. 416 (1940), defined interest as "compensation for the use or forbearance of money"; and in Old Colony R.R. v. Commissioner, 284 U.S. 552, 560, 52 S.Ct. 211, 213, 76 L.Ed. 484 (1932), the Court said, "And as respects 'interest,' the usual import of the term is the amount which one has contracted to pay for the use of borrowed money."

With these definitions in mind, it is apparent that the $2,295,205.07 which the Railway seeks to deduct as interest is not interest in fact. From 1932 to 1944 the Railroad deducted $1,591,523.23 of interest accruing on the promissory notes which were secured by the bonds and between 1944 and 1946 it continued to deduct $324,313.27 of interest on the notes. There was only one sum of borrowed money—that represented by the promissory notes—and the Railroad was allowed to deduct the accrued interest on this sum even though no interest was ever paid.

During the time the bonds were on deposit as security for the notes, there was no outstanding indebtedness against the Railroad that was represented by the bonds. The noteholders could not have collected both the interest represented by the coupons and by the notes. They were not entitled to double interest. By the same token, the Railroad was not entitled to a double deduction for income tax purposes.

This analysis still leaves us facing the fact that when the collateral bonds, due and payable in 1955 and 1956, were sold in 1944, there were coupons attached which on their face represented unpaid

---

1. Section 23(b) of the 1939 Code provides in part as follows:
   "In computing net income there shall be allowed as deductions: * * *

   "(b) *Interest.*—All interest paid or accrued within the taxable year on indebtedness * * *."

interest on the bonds from 1932 to the date of sale. If this were a true interest indebtedness, it would be difficult to say that it did not accrue in 1944 because the predated interest coupons matured and became due and payable forthwith upon the sale of the bonds. However, we have already demonstrated that the bonds did not represent any outstanding indebtedness against the Railroad while they were on deposit as security, and, therefore, that the interest coupons for that period did not represent compensation for the use of borrowed money. But since these coupons did represent an indebtedness of the Railroad *after* the sale of the bonds, how should they be treated for income tax purposes? We are of the opinion that they must be viewed as an addition to and a part of the principal amount of the bonds, that is, as an additional security for the notes. The purchase price for the bonds included both the principal of the bonds and the coupons accrued and unpaid. That these coupons were denominated interest should not blind us from the fact that they did not represent compensation for the use of borrowed money; rather, they were additional security with the bonds for the payment of the notes. To conclude otherwise would be to ignore practical realities.

Having reached this conclusion, we are satisfied that the district judge was correct in holding that the Railroad was entitled to deduct only a *pro rata* portion of the accrued coupons in the same manner as the bond discount. While this could mean that the *pro rata* discount on the accrued and unpaid coupons might have extended over the remaining life of the bonds, on the other hand, had the coupons been paid at an earlier date, the Railroad would have been entitled to a *pro rata* deduction adjusted to the shorter period.

## III.

As the second alternative issue, plaintiff contends that the Railroad was and, hence, it is entitled to a deduction in 1946 (rather than 1944) of the unamortized balance of the discount on the bonds and coupons when the bonds were exchanged for stock and cash and the property underlying the security was transferred to the new company.[2]

■■■ Ordinarily, when a corporation issues bonds or a mortgage and the property which is burdened by the secured indebtedness is transferred to a third party who assumes the indebtedness, any existing expenses or discount relating to the security financing and which is being amortized by the corporation is accelerated and the original debtor is allowed a deduction of the unamortized amount. Longview Hilton Hotel Co., 9 T.C. 180 (1947); S. & L. Building Corp. v. Commissioner, 19 B.T.A. 788, 795 (1930); Metropolitan Properties Corp. v. Commissioner, 24 B.T.A. 220, 225 (1931); Anover Realty Corp., 33 T.C. 671, 674 (1960). In accordance with these cases, the Railway argues that it became entitled to the unamortized discount because of the transfer of the bond-encumbered property to it in complete liquidation and dissolution of the Railroad.

In the usual situation, the cases which plaintiff relies upon would apply. But the present case is not of that character. The Railroad was insolvent in 1946. It paid neither interest nor principal on the bonds upon their cancellation. The corporation was dissolved and liquidated. The new company, the Railway, not only issued its stock and cash in exchange for the bonds and coupons, but it became obligated to pay the federal taxes of its predecessor in interest. By virtue of these facts, the Railway is, in reality, the one who seeks to take advantage of

2. The plan of reorganization provided that all the assets of the Railroad be transferred to a new company, the Railway, free and clear of liens (with certain limited exceptions, such as federal taxes). The new company distributed its stock and cash to the holders of the Railroad's bonds.

the deduction which it contends was available to the Railroad.

Either of two reasons precludes the granting of the refund on the basis that the unamortized balance of the discount was available as a deduction.

First, looking through form to substance, the new company was actually a continuation of the Railroad and under the rationale of Chicago R. I. & P. Ry. Co. v. Commissioner, 47 F.2d 990 (7th Cir. 1931), cert. denied, 284 U.S. 618, 52 S.Ct. 7, 76 L.Ed. 527 (1931), the unamortized discount may not be deducted. In that case this court held that unamortized discount on debenture bonds of a railroad at the time the bonds were exchanged for preferred stock of the same par value was not a loss deductible from income; that it was "purely a capital transaction, which did not result in a deductible loss."

We agree with the Government's contention that in accordance with Chicago R. I. & P. Ry. Co. if the old corporation were reorganized, no deduction would be allowed. Therefore, there is no reason why a deduction should be allowed the old corporation because a new corporation was formed which issued stock and cash pursuant to a chapter X reorganization. The successor corporation is substantially the same as the old corporation and it carried on the identical business. The old company is not entitled to a deduction which it could not have taken if the reorganization had been effected without the use of the new company.

Second, even considering the situation from a formalistic standpoint (as plaintiff insists) that there were separate entities, namely, an old company which was dissolved and liquidated and a new company which had a different capital structure and different shareholders, the Railway is not entitled to take advantage of any deduction available to its predecessor based on the unamortized bond discount.

An analogous situation existed in Anover Realty Corp., supra. In that case, it was held that a new corporation was not entitled to the unamortized portion of the discount of certain mortgage expenses which was being amortized by a different corporation that had issued the mortgage and had been dissolved. The different entity theory advanced by plaintiff is dichotomous. In order to maintain that the Railroad was entitled under the authorities it cites to an accelerated discount upon its dissolution, plaintiff says that there was no identity between the old and the new companies. Yet, these cases are authority for the proposition that the new company may not take the deduction—that it was available only to the old company.

The judgment is affirmed.